IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

IN THE MATTER OF THE SEARCH OF:
**13414 Prosper Road**
**Southport, FL  32409**

Case No. 5:20mj63-MJF

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Otilio Rivera, depose and state under penalty of perjury as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises outlined below and further described in Attachment A-20, for the things described in Attachment B.

2.      I am a Task Force Officer with the Drug Enforcement Administration ("DEA") and have been since March 6, 2018.  Prior to being assigned with the DEA, I have been a police officer with the Savannah Police Department since January 2012. I have been assigned to the Chatham Savannah Counter Narcotics Team ("CNT") drug enforcement unit since September 11, 2016. During the course of my law enforcement experience, I have participated in numerous complex domestic investigations involving drug trafficking organizations dealing in Amphetamine,

Methamphetamine, Cocaine, Oxycodone, Hydrocodone, Hydromorphone, Marijuana, and other controlled substances. In connection with my official duties as a Task Force Officer with DEA, I have closely participated in federal wiretap investigations that resulted in numerous arrests and seizures concerning drug trafficking and money laundering. I have obtained and executed numerous search and arrest warrants. I have received specialized training in the investigation of drug trafficking and drug organizations, including training in drug recognition and terminology, undercover operations, interview techniques, financial/money laundering investigations, and the use of electronic surveillance. I am personally familiar with and have used all normal methods of investigations, including but not limited to, visual surveillance; electronic surveillance; informant, witness and subject interviews; and undercover operations. In addition to this training, I have interviewed hundreds of witnesses to, and participants in, large narcotics trafficking organizations who have described to me the techniques that they and other organization members used to import and distribute illegal drugs as well as to transport, conceal, or launder the illegal drug proceeds.

3.     I am familiar with many of the traditional methods of investigation, including, visual surveillance, electronic surveillance, informant and witness interviews, consensually recorded telephone conversations, wiretap investigations, defendant debriefings, the use of confidential sources, undercover operations,

execution of search warrants, the seizure of drug evidence, and controlled purchases of drugs, among others.

4.     Based upon training and experience, I am familiar with the ways in which drug traffickers conduct their business, including the various means and methods by which drug traffickers import and distribute drugs; use cellular telephones, digital display paging devices, and calling cards to facilitate drug activity; and use numerical codes and coded language to conduct their transactions. In my experience, drug traffickers often obtain cellular telephones in fictitious names and/or the names of third parties in an effort to conceal their drug trafficking activities from law enforcement.  I also am familiar with the ways in which drug traffickers conceal, convert, transmit, and transport their drug proceeds, including, without limitation, the use of couriers to transport currency and proceeds, the use of third parties and nominees to purchase or to hold title to assets, the use of electronic wires, and the use of offshore accounts.

5.     I also know from training and experience that drug traffickers periodically change or "drop" their telephones and/or telephone numbers in an attempt to avoid law enforcement interception of their conversations.  Moreover, it is my experience that narcotics distributors purposefully use multiple communication devices (for example, cellular telephones) to keep law enforcement from understanding the full scope of their own and/or their organization's illicit

conduct, in the event that their communications are being intercepted. I also know that drug traffickers frequently use text messaging to communicate with other traffickers in an effort to thwart law enforcement interception of communications.

6.     Based on my training and experience, I am also familiar with how organized crime, such as Mexican cartels and Asian organized crime groups, conduct their businesses, including the various means and methods of using multiple business entities to wire illegal funds through legitimate businesses, and to engage in trade-based money laundering, in an effort to hide illegal proceeds from international drug trafficking, wildlife trafficking, and other crimes.

7.     I have participated in investigations with other Special Agents and investigators who have received specialized training in computer forensics and the extraction and use of information from computers, cellular devices, wireless providers, wireless networks, and storage devices. I have personally assisted investigations where data extracted from electronic devices, such as computers and cellular devices, have produced valuable information to aid prosecutions.

8.     The information contained in this affidavit is based on my own personal knowledge of this case, as well as information relayed to me by other law enforcement authorities and sources of information. The facts related in this affidavit do not reflect the totality of information known to me or other officers, merely the amount sufficient to establish probable cause. I do not rely upon facts

not set forth herein in reaching my conclusion that a warrant should be issued, nor do I request that this Court rely upon any facts not set forth herein in reviewing this affidavit in support of the application for search warrant.

9.     Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed. Such statements are stated in substance, unless otherwise indicated. Wherever in this affidavit I state a belief, that belief is based upon my training and experience and the information obtained through this investigation. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18 and Title 21 have been committed by known and unknown conspirators. There is probable cause that the information described in Attachment B will constitute evidence of the criminal violations.

## OVERVIEW

10.   Since 2015, the DEA, the Special Investigations Unit of the United States Fish and Wildlife Service (USFWS), the  United States Postal Inspection Service (USPIS), and Homeland Security Investigations (HSI), have been investigating a transnational criminal organization (TCO) that is engaged in international money laundering, drug trafficking, wildlife trafficking, and other crimes.  Members of this TCO are located throughout the United States and in

5

Canada, Mexico, and Hong Kong.  Members of this TCO are associated with Mexican drug cartels and Asian organized crime.

11.    Agents used a number of investigative techniques to identify members of this conspiracy and to identify the manner and means of the operation.  As explained in more detail below, agents interviewed witnesses, used confidential sources, conducted a grand jury investigation, reviewed email records obtained from federal search warrants, conducted financial analysis of bank records, reviewed cell phones searched at the United States border and pursuant to federal search warrants, reviewed export permit applications and supporting documents for transporting wildlife, reviewed business records, obtained shipping labels and postal records, conducted multiple undercover operations, recorded criminal conversations, obtained a federal consensual wire, conducted physical surveillance, and used other investigative tools.  In addition, undercover federal agents infiltrated this TCO and assisted with undercover operations.  The undercover operations were conducted over a period of several years and included controlled purchases of pounds of marijuana, reverse money laundering transactions totaling one million dollars United States currency, and controlled transactions regarding the sale, transportation and distribution of prohibited wildlife species.

12.    Agents were able to determine that (1) Serendipity Business Solutions, LLC, (2) Terry Xing Zhao Wu, (3) Natalie Ye Man Chan Wu, (4) Woonjin Lam, (5) Anthony Wu, (6) Billy Chen, (7) Ying Le Pang, (8) Phoenix Fisheries, LLC, (9) Mark

Leon Harrison, (10) Heather Huong Ngoc Luu, (11) Lam Phuoc Quang, (12) Kevin Chinh Nguyen, (13) Elias Samuel Castellanos, (14) Terry Louis Shook, and others, were members and associates of the Wu TCO, whose members and associates engaged in wire fraud, mail fraud, international wildlife trafficking, drug trafficking, and money laundering, among other crimes, within the Southern District of Georgia, Northern District of Georgia, Northern District of California, Central District of California, Northern District of Florida, Eastern District of Michigan, Hong Kong, Mexico, Canada, and elsewhere.

13.    Agents determined that the purpose of the Wu TCO was to make money from illegal activities, including wildlife trafficking and drug trafficking.  Agents further determined that the Wu TCO sought to hide millions of dollars in illegal proceeds by laundering money through businesses and bank accounts.

14.    Agents determined the manner and means of this conspiracy. Essentially, one or more members of the conspiracy would (1) avoid international, federal, and state wildlife trafficking laws to make money and meet the demand for shark fins and sea cucumbers in the Asian market; (b) create and submit false applications for import/export licenses to United States Fish and Wildlife Services to appear legitimate while conducting business regulated by international, federal, and state wildlife trafficking laws; (c) unlawfully smuggle shark fins from Mexico to ultimately be exported to Hong Kong; (d) hide an unlawful shark fin business in California by creating fake invoices and paperwork to make it appear that a Florida

7

business was invoicing, financing, and controlling the shark fin business; (e) wire illegal profits from the shark fin business to third party business accounts to hide the illegal profits; (f) make money by distributing marijuana in violation of federal law; (g) require bulk cash be mailed to California for advanced payment of marijuana; (h) require wire transfers of money to bank accounts for advanced payment of marijuana; (i) mail marijuana from California to Savannah, Georgia; (j) hide illegal drug proceeds as purported seafood transactions; (k) wire illegal drug proceeds to third party business accounts to hide the illegal profits; (l) charge a commission fee for unlawfully depositing millions of dollars of illegal profits into business accounts to hide the illegal profits; (m) deposit bulk cash from drug trafficking, into third party business accounts that dealt in gold, precious metals, and jewels to hide the illegal profits; and (n) unlawfully deposit millions of dollars from illegal activities into third party business accounts located in the United States, Mexico, and Hong Kong, all to hide the illegal profits.

15.    On July 8, 2020, a federal grand jury presiding in the Southern District of Georgia returned a sealed indictment charging the following defendants for their role in this conspiracy to engage in wire and mail fraud, drug trafficking, and money laundering: (1) Serendipity Business Solutions, LLC; (2) Terry Xing Zhao Wu; (3) Natalie Ye Man Chan Wu; (4) Woonjin Lam; (5) Anthony Wu; (6) Billy Chen; (7) Ying Le Pang; (8) Phoenix Fisheries, LLC; (9) Mark Leon Harrison; (10) Heather Huong Ngoc Luu; (11) Lam Phuoc Quang; (12) Kevin Chinh Nguyen; (13) Elias Samuel

Castellanos; and (14) Terry Louis Shook.  This indictment will remain sealed until the defendants are arrested, or until further order of the court.

## THE WU TRANSNATIONAL CRIMINAL ORGANIZATION

16.    Defendant Serendipity Business Solutions, LLC is a California company that engages in international wildlife trafficking, drug trafficking, and money laundering.

17.    Defendant Terry Xing Zhao Wu is the operator of Defendant Serendipity Business Solutions, LLC and responsible for ordering when to export shark fins and authorizing payments for shark fins and sea cucumbers.  Defendant Terry Xing Zhao Wu also handles the sale of shark fins to conspirators in Hong Kong.

18.    Defendant Natalie Ye Man Chan Wu is the registered agent and manager of Defendant Serendipity Business Solutions, LLC.  Defendant Natalie Ye Man Chan Wu is responsible for conducting financial transactions and signing checks for payment of shark fins.

19.    Defendant Woonjin Lam is an associate of Defendant Terry Xing Zhao Wu and involved in the distribution of marijuana and money laundering.  Woonjin Lam is was responsible for coordinating and conducting drug transactions.

20.    Defendant Anthony Wu is an associate of Defendant Woonjin Lam and involved in money laundering.

21.    Defendant Billy Chen is an associate of Defendant Terry Xing Zhao Wu and involved in international wildlife trafficking.

22.    Defendant Ying Le Pang is an associate of Defendant Woonjin Lam and involved in the distribution of marijuana. Defendant Ying Le Pang assists Defendant Woonjin Lam in drug transactions.

23.    Defendant Phoenix Fisheries, LLC, is a Florida company that engaged in international wildlife trafficking and money laundering.

24.    Defendant Mark Leon Harrison is the owner, incorporator, registered agent, and manager of Defendant Phoenix Fisheries, LLC.  Defendant Mark Leon Harrison is responsible for preparing false and misleading commercial invoices and export documents for shark fins for Defendant Phoenix Fisheries, LLC.  Defendant Mark Leon Harrison is an associate of Defendant Terry Xing Zhao Wu, and involved in international wildlife trafficking.

25.    Defendant Heather Huong Ngoc Luu is an associate of Defendants Terry Xing Zhao Wu, Woonjin Lam, Lam Phuoc Quang, Kevin Chinh Nguyen, Elias Samuel Castellanos, and Terry Louis Shook, and involved in money laundering and drug trafficking.  Defendant Heather Huong Ngoc Luu is responsible for transporting bulk cash from illegal proceeds and wiring the illegal proceeds to third party business bank accounts to hide millions of dollars in illegal proceeds.

26.    Defendant Lam Phuoc Quang is an associate of Defendants Terry Xing Zhao Wu, Woonjin Lam, Heather Huong Ngoc Luu, Kevin Chinh Nguyen, and Elias

Samuel Castellanos, and involved in money laundering and drug trafficking. Defendant Lam Phuoc Quang is responsible for transporting bulk cash from illegal proceeds to be wired to third party business bank accounts to hide millions of dollars in illegal proceeds.

27.     Defendant Kevin Chinh Nguyen is an associate of Defendants Heather Huong Ngoc Luu and Lam Phuoc Quang and involved in money laundering and drug trafficking.  Defendant Kevin Chinh Nguyen is responsible for transporting bulk cash used in money laundering.

28.     Defendant Elias Samuel Castellanos is an associate of Defendants Heather Huong Ngoc Luu, Lam Phuoc Quang, and involved in money laundering and drug trafficking. Defendant Elias Samuel Castellanos is responsible for transporting bulk cash from illegal proceeds.

29.     Defendant Terry Louis Shook is an associate of Defendants Heather Huong Ngoc Luu and Lam Phuoc Quang and involved in money laundering and drug trafficking.

30.     I make this affidavit in support of an application for search warrants concerning violations of conspiracy to commit wire and mail fraud in violation of Title 18, United States Code, Section 1349; (2) drug trafficking conspiracy in violation of Title 21, United States Code, Section 846; and (3) money laundering conspiracy in violation of Title 18, United States Code, Section 1956(h), hereinafter collectively referred to as the "Target Offenses."

## TARGET LOCATIONS

31.     Based on my training and experience and this entire investigation, I believe there is probable cause that evidence of some or all of the Target Offenses will be found at the following locations, which includes the premises location, hereinafter collectively referred to as the "Target Locations," and individually described as follows:

i.      1340 Skyview Drive, Burlingame, California 94010, hereinafter referred to individually as "Target Location 1" and described in more detail in Attachment A-1. Target Location 1 is the residence of Terry and Natalie Wu. Target Location 1 is also one of the business addresses listed with the California Secretary of State for Serendipity Business Solutions, LLC.

ii.     715 El Camino Real, Suite 201, San Bruno, California 94066, hereinafter referred to individually as "Target Location 2" and described in more detail in Attachment A-2. Target Location 2 is one of the business address listed with the California Secretary of State for Serendipity Business Solutions, LLC.

iii.    715 El Camino Real, Suite 202, San Bruno, California 94066, hereinafter referred to individually as "Target Location 3" and described in more detail in Attachment A-3. Target Location 3 is one of the business addresses listed with the California Secretary of State for Serendipity Business Solutions, LLC.

12

iv.     167 Gaven Street, San Francisco, California 94134, hereinafter referred to individually as "Target Location 4" and described in more detail in Attachment A-4. Target Location 4 is the residence of Woonjin Lam. Target Location 4 is also the business addresses listed with the Florida Secretary of State for Woonjin Lam.

v.     182 Gaven Street, San Francisco, California 94134, hereinafter referred to individually as "Target Location 5" and described in more detail in Attachment A-5. Target Location 5 is a residential address associated with Woonjin Lam.

vi.     18002 Via Arroyo, San Lorenzo, California 94580, hereinafter referred to individually as "Target Location 6" and described in more detail in Attachment A-6. Target Location 6 is the residential address of Ying Le Pang.

vii.     610 E. 10th Street, Oakland, California 94606, hereinafter referred to individually as "Target Location 7" and described in more detail in Attachment A-7. Target Location 7 is a warehouse used by the Wu TCO to store and cultivate marijuana for distribution.

viii.     1622 12th Street, Oakland, California 94607, hereinafter referred to individually as "Target Location 8" and described in more detail in Attachment A-8. Target Location 8 is a warehouse used by the Wu TCO to store and cultivate marijuana for distribution.

13

ix.     1285 47th Avenue, Oakland, California 94601, hereinafter referred to individually as "Target Location 9" and described in more detail in Attachment A-9.  Target Location 9 is a warehouse used by the Wu TCO to store and cultivate marijuana for distribution.

x.     1493 Fairlance Dr., Walnut, California 91789, hereinafter referred to individually as "Target Location 10" and described in more detail in Attachment A-10.  Target Location 10 is the residence of Billy Chen.  Target Location is also a business address listed with the California Secretary of State for QBC International, Inc.  QBC International, Inc. is a California corporation engaged in international wildlife trafficking and money laundering.

xi.     QBC International Inc., 9721 Alpaca Street, South El Monte, California 91733, hereinafter referred to individually as "Target Location 11" and described in more detail in Attachment A-11.  Target Location 11 is one of the business addresses listed on importation paperwork for sea cucumbers, on an Import Export License issued by the USFWS, and is used by QBC International Inc. and the WU TCO to facilitate wildlife trafficking and money laundering.

xii.     13668 Eastbridge Street, Westminster, California 92683, hereinafter referred to individually as "Target Location 12" and described in more detail in Attachment A-12. Target Location 12 is a residence of Heather Luu.  Target

Location 12 is also the address listed for multiple business entities used by Heather Luu and the Wu TCO for trade-based money laundering.

xiii.    Jeans Jewelry, Inc., 9200 Bolsa Avenue, Suite 114C, Westminster, California 92683, hereinafter referred to individually as "Target Location 13" and described in more detail in Attachment A-13. Target Location 13 is a jewelry business used by Heather Luu and the Wu TCO for trade-based money laundering.

xiv.    Ohansons, LLC 607 S. Hill Street, Suite 520, Los Angeles, California 90014, hereinafter referred to individually as "Target Location 14" and described in more detail in Attachment A-14. Target Location 14 is one of the business addresses connected to bank accounts used by the Wu TCO for trade-based money laundering.

xv.    Ohansons, LLC 607 S. Hill Street, Suite 915, Los Angeles, California 90014, hereinafter referred to individually as "Target Location 15" and described in more detail in Attachment A-15. Target Location 15 is one of the business addresses connected to bank accounts used by the Wu TCO for trade-based money laundering.

xvi.    160 Taggart Run NW, Lawrenceville, Georgia 30044, hereinafter referred to individually as "Target Location 16" and described in more detail in Attachment A-16. Target Location 16 is a residence connected to Heather Luu and Lam Phuoc Quang.

15

xvii.    5296 Rails Way, Norcross, Georgia 30071, hereinafter referred to individually as "Target Location 17" and described in more detail in Attachment A-17. Target Location 17 is a residence connected to Heather Luu and Lam Phuoc Quang.

xviii.    1205 Devonshire Road, Grosse Pointe Park, Michigan 48230, hereinafter referred to individually as "Target Location 18" and described in more detail in Attachment A-18. Target Location 18 is the residence of Terry Louis Shook.

xix.    13408 Prosper Road, Southport, Florida 32409, hereinafter referred to individually as "Target Location 19" and described in more detail in Attachment A-19. Target Location 19 is the business address listed with the Florida Secretary of State for Phoenix Fisheries, LLC.

xx.    13414 Prosper Rd., Southport, Florida 32409, hereinafter referred to individually as "Target Location 20" and described in more detail in Attachment A-20. Target Location 20 is one of the business addresses associated with Serendipity Business Solutions, LLC and Phoenix Fisheries, LLC.

xxi.    Greg Abrams Seafood, Inc., 234 East Beach Drive, Panama City, Florida 32401, hereinafter referred to individually as "Target Location 21" and described in more detail in Attachment A-21. Target Location 21 is the business address of Greg Abrams Seafood, Inc., a Florida corporation engaged in the seafood

business.  Greg Abrams Seafood, Inc. is a shark fin dealer and the business is used to assist the WU TCO in trafficking shark fins and sea cucumbers.

xxii.    Phillips Seafood, Inc., 1418 Sapelo Ave NE, Townsend, Georgia 31331, hereinafter referred to individually as "Target Location 22" and described in more detail in Attachment A-22.  Target Location 22 is the business address for Phillips Seafood, a Georgia corporation engaged in the seafood business.  Phillips Seafood, Inc. is a shark fin dealer and supplies shark fins to the Wu TCO.

32.    Attachments A-1 through A-22 are incorporated by reference as if fully set forth herein.

## PROBABLE CAUSE

### Background Information on Shark Finning

33.    Sharks are an apex predator and maintain an essential role in earth's marine ecosystem.  Sharks are protected wildlife under federal and state law to ensure their continued sustainability.

34.    Shark finning is the practice of removing and retaining shark fins at sea while the remainder of the living shark is commonly discarded and left to die in the ocean.  Shark finning is aimed at supporting the demand for shark fin soup, an Asian delicacy.  Federal law and applicable state law prohibit shark finning at sea.

*See* 18 U.S.C. § 1857(1)(P), Ca. Fish and Game Code § 2021, and Fla. Stat. Ann. § 379.2426.

35.     A landed shark is a harvested shark that has been brought to shore. There is very little financial incentive for commercial shark fishermen to land whole sharks because the price per pound of shark meat is significantly lower than the price per pound of shark fins.

36.     The Lacey Act, a federal fish and wildlife trafficking law, makes it unlawful for a person to make or submit a false record, account or identification of wildlife that has been or is intended to be transported in interstate or foreign commerce.  16 U.S.C. § 3372(d).

37.     Effective January 1, 2013, it was unlawful to sell, possess, trade or distribute shark fins in or from California.   Ca. Fish and Game Code § 2021. However, at all times material to this affidavit, Florida law allowed state licensed dealers to buy and sell saltwater products, including shark fins, so long as the licensed dealer reported the landing as required by Florida law and harvested or landed the entire shark.  Fla. Stat. Ann. § 370.07.  Although a licensed dealer could buy and sell shark fins, Florida law required that all sharks must be retained in whole condition with heads, tails, and fins attached until landed and specifically prohibited the practice of shark finning.  Fla. Stat. Ann. § 379.2426.

38.   Thus, after January 1, 2013, licensed dealers in Florida, but not California, could sell, possess, trade or distribute shark fins provided the dealer properly harvested the entire shark and accurately recorded, accounted, and identified all shark fins shipped in interstate or foreign commerce to ensure the harvesting, shipping, and transportation of the protected wildlife complied with federal and state law.

## Background on CITES Import and Export Permits

39.   The United States is a party to the Convention on International Trade of Endangered Species of Fauna and Flora (CITES) international agreement. CITES regulates the international trade and transport of species that are threatened with extinction (Appendix I), species that are not currently threatened with extinction, but would become so absent regulation (Appendix II), and species for which a member country requests assistance in controlling trade (Appendix III). There are currently ten species of sharks listed in the CITES Appendixes, specifically CITES Appendix II. The Scalloped hammerhead, the Great hammerhead, and the Smooth hammerhead are among the ten listed species. A CITES Import/Export Permit is required to import or export sharks listed in CITES Appendix II based on the origin of the specimens. All applications made to the USFWS for a CITES Import/Export Permit require supporting documentation to sustain a non-detrimental finding on populations of sharks for the species to be imported or exported. Section D-3 of the

19

application requires the applicant to certify the information submitted in the application is complete and accurate. Further, Section D-3 states any false statement may subject the applicant to penalties of Title 18, United States Code, Section, 1001. There is a significant regulatory structure in the United States overseeing the balance between recreational and commercial shark fishing industries and shark conservation. For example, federal regulations make it unlawful to retain, possess, sell or purchase a federally protected shark, or parts or pieces thereof. 50 C.F.R. § 635.71(d) (10). Federal regulations also require that only dealers that have a valid permit for sharks may purchase a shark from the owner or operator of a fishing vessel. 50 C.F.R. § 635.31. Among other things, federal law requires exporters of CITES Appendix II specimens to present proof of landings from the fishermen when applying for a CITES permit and invoices for the purchase of shark fins from the permitted dealer. Additionally, when protected wildlife, for instance CITES Appendix II specimens, is exported or transported in interstate commerce, the law requires the items to be labeled truthfully.

## Background Information on Trade-Based Money Laundering

40.     Trade-based money laundering generally involves the exploitation of the international trade system for the purpose of transferring value and hiding the true origins of wealth. TCOs engaged in trade-based money laundering disguise

20

proceeds of criminal activity, such as drug trafficking and wildlife trafficking, and move value through trade transactions to try and legitimize the criminal proceeds.

41.     Trade-based money laundering includes the misrepresentation of the price, quantity, or quality of imports or export. The basic techniques of trade-based money laundering include invoicing products above or below market value, providing multiple invoices for the same transaction, misstating the quantity of products exported or imported, and falsely describing products exported or imported.

42.     TCOs, including the Wu TCO, use various combinations of the basic techniques of trade-based money laundering in a scheme to hide drug and unlawful wildlife trafficking proceeds.

## TARGET LOCATIONS 1-3 AND 19-20

43.     Based on this entire investigation and my training and experience, I believe the Wu TCO uses Target Locations 1-3 and Target Locations 19 and 20 in furtherance of its unlawful wildlife trafficking and money laundering business.

44.     Target Location 1 is Terry and Natalie Wu's residence and also a business address for Serendipity Business Solutions, LLC. Target Location 2 and Target Location 3 are business suites located next to each other in a commercial office building. The Wu TCO uses Target Locations 1-3 as addresses for Serendipity Business Solutions on bank records associated with accounts used to launder money.

The Wu TCO also uses Target Locations 1-3 as business addresses on shipping records for its unlawful shark fin and sea cucumber business.

45.   Target Location 19 is Mark Harrison's residence and is also the business address for Phoenix Fisheries. Target Location 19 includes a residence and shipping containers that Mark Harrison uses to dry and store shark fin inventory and sea cucumbers. Target Location 20 is land adjacent to Target Location 19. Target Location 20 has outbuildings, shipping containers, and tractor trailers and Mark Harrison uses Target Location 20 to store shark fin and sea cucumber inventory.

**Mark Harrison's Prior Conviction for Unlawfully Dealing in Shark Fins**

46.   In 2005, the USFWS previously investigated Mark Harrison and his former company, Harrison International, LLC, which resulted in a federal conviction. The investigation revealed that Harrison represented himself to be the nation's largest shark fin buyer, purchasing "millions" of shark fins since he had been in the business, beginning in 1989. Harrison purchased shark fins in Florida from individual fishermen and later resold them in interstate commerce and foreign commerce. No report of the landing or sale of those fins was filed with any Florida authorities, as required by law. At that time, Mark Harrison lived at Target Location 19 and operated Harrison International, LLC from Target Location 19.

47.   During the course of the 2005 investigation of Harrison, agents confirmed that Harrison was shipping large quantities of shark fins to California

and Hong Kong. Harrison facilitated the export of shark fins from Florida to California and from Florida to Hong Kong. Shipping documents obtained during the investigation revealed Harrison sold and exported shark fins exclusively to an import and export company by the name of Wonkow International located in San Francisco, California and Hong Kong. Wonkow International was owned by Allen Leung.

48.    Allen Leung also owned Mark Harrison's residence, Target Location 19 and Target Location 20, land adjacent to Target Location 19.

49.    Allen Leung was a leader of the Ghee Kung Tong Brotherhoods, a/k/a "Tongs," an Asian organized criminal organization, and ran the import-export business. Allen Leung was alleged to have laundered drug trafficking proceeds through a shark fin business.

50.    In 2006, Allen Leung was murdered at the San Francisco business location for Wonkow International, 603 Jackson Street, San Francisco, California. Kwok Cheung Chow, a/k/a "Raymond Chow," a/k/a "Shrimp Boy," a member of the Triad criminal organization, was eventually charged and convicted of arranging the murder of Allen Leung in U.S. District Court for the Northern District of California. *See United States v. Kwok Cheung Chow*, No. 3:14CR00196-CRB, 2015 WL 5094744 (N.D. Cal. 2015). Chow is serving a life sentence.

51.    The 603 Jackson Street address in San Francisco where Allen Leung was murdered, was the same address where Mark Harrison shipped the shark fins

23

to in San Francisco during the 2005 investigation. A search of 603 Jackson Street revealed a stockpile of shark fins in the basement stacked floor to ceiling.

52.     After Allen Leung's murder, Harrison continued to send shark fins to San Francisco and Hong Kong until January 2007, when the 2005 investigation into Harrison's activity turned overt.

53.     On June 12, 2009, Mark Harrison and Harrison International, LLC, pleaded guilty in U.S. District Court for the Northern District of Georgia to violating the Lacey Act, by unlawfully dealing in shark fins, the landing of which was not reported as required by law.  In addition, Harrison pleaded guilty to a second charge related to his attempted export of shark fins of species that are prohibited to harvest under the laws of the state of Florida.  Specifically, Harrison pleaded guilty to attempting to export through Atlanta a shipment of shark fins that included hundreds of shark fins from sharks that were protected under Florida and/or federal law due to the low population levels of the shark species.  Harrison also pleaded guilty to a third charge related to trading in shark fins that had been prepared, packed or held under unsanitary conditions.

### The Current Investigation

54.     In 2015, USFWS agents again received information that Mark Harrison was again involved in the unlawful trafficking of shark fins with Asian organized crime and began this current investigation.

55.    As part of this current investigation, agents opened an undercover business in Savannah, Georgia and they have been operating in an undercover capacity as an international seafood logistics company.  In an undercover capacity, agents have identified a number of conspirators who have lied on federal paperwork related to the export of shark fins; and who appear to be involved in a global conspiracy.  Agents reviewed a number of financial and property records and learned that Mark Harrison is still living at the same residence at 13408 Prosper Drive, Southport, Florida, Target Location 19.  Target Location 19 and Target Location 20, were both previously owned by deceased Allen Leung, and are now owned by Serendipity Business Solutions, a company owned by Terry Wu, located in California and operating out of Target Location 1, Target Location 2 and Target Location 3. Agents were able to determine that Terry Wu is the son of Kwong Fat Ng, owner of Shun Fat Seafood Product Trading Company in Hong Kong and previous business partner to Allen Leung.

56.    Based on my training and experience and this entire investigation, I believe that Terry Wu and his conspirators launder money for a number of criminal organizations, including Asian organized crime and Mexican cartels as outlined below in more detail.  I further believe that Terry Wu took over the business from Allen Leung after his murder.  I further believe that Mark Harrison is conducting illegal trafficking at Target Locations 19 and 20 at the direction of Terry Wu and Serendipity Business Solutions operating out of Target Locations 1-3 and supplying

25

shark fins to Shun Fat Seafood Products Trading Company in Hong Kong in violation of California and federal law.

### Mark Harrison Opens a New Shark Fin Business for the Wu TCO

57.   In 2011, the State of California enacted legislation that prohibited the sale, possession, trade or distribution of shark fins in California. The California prohibition took effect on January 1, 2013. Ca. Fish and Game Code § 2021.

58.   In June 2013, Harrison incorporated a business in Florida named Panhandle Chili Ribbons, and later renamed that business Phoenix Fisheries, LLC ("Phoenix Fisheries") in February 2014. Phoenix Fisheries is engaged in the exportation of shark fins. Phoenix Fisheries operates out of Target Locations 19 and 20 in Florida and uses Target Locations 19, 20 and for the exportation of shark fins.

59.   On September 8, 2014, a USFWS Wildlife Inspector stationed at the Port of Atlanta received an email correspondence from freight forwarder Aries Global Logistics located in Hapeville, Georgia that their customer, later identified as Mark Harrison / Phoenix Fisheries (Target Location 19), sought to export Great and Scalloped Hammerhead shark fins through the Port of Atlanta. Aries Global Logistics was seeking clarification concerning the proper documentation and required permits by the USFWS to export the Great and Scalloped Hammerhead shark fins from the Port of Atlanta.

60.    As part of the USFWS investigation into Harrison and Phoenix Fisheries, USFWS investigators examined property records for Target Locations 19 and 20.   Property records revealed that Harrison's residence in Florida, Target Location 19, is owned by Serendipity Business Solutions, LLC, a California limited liability corporation.  Serendipity Business Solutions also owns Target Location 20, which is adjacent to Target Location 19.  Target Location 20 is used to store, dry, and ship inventory prior to export.  As part of this investigation, agents searched Terry Wu's cell phone pursuant to a border search, which was followed with a federal search warrant.  A review of Terry Wu's cell phone showed pictures and WhatsApp communication regarding wildlife inventories occasionally stored in Target Location 20.

61.    Serendipity Business Solutions purchased Target Location 19 and Target Location 20 from Jenny Leung (Allen Leung's widow) on October 26, 2015, just two days after Harrison submitted an application to acquire a CITES Export Permit Application for Phoenix Fisheries to export shark fins.

62.    According to California Corporate records, Serendipity is a "business consulting and trading" company, with a business address of 1340 Skyview Drive, Burlingame, California, Target Location 1.  Serendipity Business Solutions was registered on June 4, 2013, just two weeks before Phoenix Fisheries was originally registered in Florida.  The registered agent for Serendipity is identified as Natalie Wu.  Natalie Wu is married to Terry Wu, and property records reveal that the Wus

reside at 1340 Skyview Drive, Burlingame, California, Target Location 1. Target Location 2 and Target Location 3 are also business address listed with the California Secretary of State for Serendipity Business Solutions, LLC. On the 2013 articles of organization, Natalie Wu with an address of Target Location 1, is identified as the agent who will accept service of process for Serendipity Business Solutions, LLC. In 2017, Target Location 1 is again listed as the address for Serendipity Business Solutions, LLC in the statement of information filed with the California Secretary of State. In 2019, Target Location 2 and Target Location 3 are both listed as address for Serendipity Business Solutions LLC in the statement of information filed with the California Secretary of State. Natalie Wu remained the listed manager, owner, and service of process for Serendipity Business Solutions, LLC.

63.     USFWS investigators obtained financial records for Serendipity to further examine the connection between Serendipity and Harrison. A review of those financial records for the time period of November 23, 2013, through January 31, 2020, showed that Shun Fat of Hong Kong wired approximately $7,000,000 into the Serendipity JP Morgan Chase bank account, ending in 5225. The addresses associated with this Serendipity bank account is Target Location 1 and 2. During that same time period, the financial records showed substantial payments to Harrison by Serendipity, totaling over $900,000. Through these financial transactions, the WU TCO purchased shark fins in a manner to conceal the ownership, to control the property and proceeds, and to defraud others.

**Materially false invoices/sales receipts submitted by Harrison**

64.    The following table represents invoices submitted by Mark Harrison as part of the CITES Export Permit Application for Phoenix Fisheries.  The invoices are purported to be records of purchase of shark fins by Phoenix Fisheries with an address of Target Location 19.  Based upon a review of financial records, none of these invoices were actually paid by Phoenix Fisheries; rather, all of the invoices were actually paid for by Serendipity Business Solutions with an address of Target Location 1:

| DATE | CHECK / WIRE | AMOUNT | SHARK DEALER |
|---|---|---|---|
| 04/15/2015 | Wire | $4,167 | Kings Seafood |
| 04/18/2015 | Check # 1201 | $9,597 | Safe Harbor Seafood |
| 05/07/2015 | Wire | $7,612 | Safe Harbor Seafood |
| 05/19/2015 | Wire | $8,393 | Safe Harbor Seafood |
| 05/19/2015 | Wire | $12,431 | Kings Seafood |
| 08/03/2015 | Wire | $4,378.25 | Kings Seafood |
| 08/07/2015 | Wire | $7,913 | Kings Seafood |
| 08/07/2015 | Wire | $14,715.50 | Safe Harbor Seafood |
| 08/25/2015 | Check # 1209 | $2,471 | Day Boat Seafood |
| 08/25/2015 | Check # 1207 | $6,337 | Phillips Seafood |
| 08/27/2015 | Wire | $9,733 | Kings Seafood |
| 09/22/2015 | Wire | $8,381.50 | Kings Seafood |
| 09/22/2015 | Wire | $1,497 | Kings Seafood |
| 09/30/2015 | Wire | $1,074 | Kings Seafood |
| 09/30/2015 | Wire | $3,553 | Kings Seafood |

65.     In the CITES Export Permit Application, Harrison failed to include any information about his connection to Serendipity, the connection between Serendipity and Shun Fat (where Harrison planned to ship all of his shark fins), or the substantial payments to Harrison by Serendipity.

66.     All of the wires and checks were paid from Serendipity's JP Morgan Chase bank account, ending in 5225. The address associated with this Serendipity bank account is currently Target Location 2 according to JP Morgan Chase records. At the time period referenced in these wires and checks, the address associated with this Serendipity bank account was Target Location 1. Because all of the invoices submitted by Harrison with the CITES Export Permit Application for Phoenix Fisheries were actually paid by Serendipity, Harrison's submission of those invoices rendered the CITES Export Permit Application materially false and misleading.

67.     On March 15, 2016, USFWS denied Harrison's application for a CITES Export Permit. Harrison submitted a reconsideration request on April 29, 2016, which was denied on May 31, 2016. Harrison appealed to the Director of the USFWS on July 20, 2016 and was denied on August 25, 2016.

68.     A recent analysis of Serendipity's financial records for the time period of August 1, 2019, through December 31, 2019, revealed that the WU TCO continued to purchase shark fins from the same shark fin dealers listed on Harrison's CITES Export Permit Application. The address on the bank account for Serendipity records

paying for the shark fins during this time period was Target Location 1. The table outlined below details WU's payments to shark fin dealers:

| DATE | PURCHASE OF | AMOUNT | SHARK DEALER |
|------|-------------|--------|--------------|
| 08/09/2019 | Shark Fins | $20,000 | Seafood Atlantic |
| 10/24/2019 | Shark Fins | $8,718 | Day Boat Seafood |
| 12/18/2019 | Shark Fins | $8.608 | Safe Harbour Seafood |
| 12/18/2019 | Shark Fins | $2,121 | Bryant Products |
| 12/27/2019 | Shark Fins | $10,000 | Madeira Beach Seafood |

69.     All of the purchases outlined above were paid from Serendipity Chase bank account, ending in 5225.  The address associated with this Serendipity bank account is currently Target Location 2 according to JP Morgan Chase records.  At the time period referenced in these wires and checks, the address associated with this Serendipity bank account was Target Location 1.  Again, these purchases were made in a manner to conceal the ownership, to control the property and proceeds, and to defraud others.

## Export Paperwork

70.     USFWS investigators also reviewed shipping records for shipments of dried shark fins by Phoenix Fisheries, with an address of Target Location 19, and found further connections to Wu and Serendipity.  For example, on December 13, 2017, shipping records showed that Phoenix Fisheries (Target Location 19) exported 944 kg of dried shark fins through the Port of Atlanta destined to Shun Fat in Hong

Kong. The shark fins were shipped from Target Location 21. The Air Waybill located with this shipment requested the airlines to notify Terry Wu upon arrival in Hong Kong. The Waybill did not mention Serendipity. A Commercial Invoice # 047 dated 12/5/17, itemized dried shark fins sold by Phoenix Fisheries to Shun Fat Sea Products Trading Company for $88,480. This paperwork for the export involving Target locations 19 and 21 concealed the ownership, concealed who was controlling the property and proceeds, and defraud others. Shun Fat is the same Hong Kong based company that wired approximately $7 million to Serendipity with an address of Target Location 1 from November 23, 2013 through January 31, 2020.

71.     As of March 17, 2020, shipping records reviewed indicate Phoenix Fisheries (Target Location 19) has exported sixty-five shipments of dried shark fins through the Port of Atlanta and the Port of Savannah to Shun Fat in Hong Kong. Many of these exports show an average weight of approximately 500 kilograms with a conservative market value of approximately $45,000.

### Members of the Wu TCO Email Communications

72.     As part of this investigation, agents obtained federal search warrants for multiple email accounts, including Terry Wu's Gmail account, twu0723@gmail.com, and Mark Harrison's AOL account, mhfinman@aol.com. Upon reviewing the emails, agents learned that Harrison, Natalie Wu, and Terry Wu, use email to communicate about the seafood operations for the Wu TCO. Additionally, the email records show that Harrison regularly communicates with Natalie and

Terry Wu concerning paying the shark fin dealers, shipping the shark fins to Hong Kong, and getting paid for Phoenix Fisheries' company expenses.

73.     For example, on March 5, 2014, Natalie Wu sent Mark Harrison and Terry Wu an email concerning a wire transfer to a shark fin dealer.  The email contained a photo of a wire transfer confirmation that shows $14,950 being wired into a "Mark's vendor" bank account.  Agents have determined this vendor to be Henry Hung of Venice Seafood located in Venice, Louisiana.  In the message section of the wire transfer confirmation, it is notated, "purchase 1300 lbs of fins."  Agents further confirmed that the wire transfer originated from Serendipity Business Solutions, LLC Chase bank account ending in 5225.  Chase records have Target Locations 1 and 2 as the address for this bank account.  Based on my training and experience and this investigation through indictment, I believe that Terry and Natalie Wu through Serendipity Business Solutions, rather than Mark Harrison and Phoenix Fisheries, were paying for shark fins to be shipped to Shun Fat in Hong Kong, in violation of California and federal law.

74.     As another example, on April 2, 2014, Natalie Wu sent an email to Mark Harrison and copied Terry Wu concerning paying Mark Harrison for company expenses.  The email contained a photograph of a wire transfer confirmation that shows $8,000 being wired into Mark Harrison's Phoenix Fisheries Regions Bank account ending in 7420 for company expenses.   The wire originated from

Serendipity's JP Morgan Chase bank account ending in 5225. Bank records have Target Locations 1 and 2 associated with the bank account. Based on my training and experience and this entire investigation, I believe that Terry and Natalie Wu through Serendipity Business Solutions are paying the business expenses of Mark Harrison and Phoenix Fisheries and ultimately paying for shark fins to be shipped to Shun Fat in Hong Kong, all in violation of California and federal law.

75.     As another example, on January 10, 2017, Natalie Wu sent an email to Mark Harrison concerning a shark fin dealer, Viking Village. The email notified Harrison that all payments were up to date and included five photographs of attachments to the email which displayed recent payments. One photograph displayed an envelope addressed to Viking Village with a return address of Harrison at Target Location 19. The photograph also included Serendipity Business Solutions, LLC check #1277 from Chase bank account ending in 5225 with an address of Target Location 1.

76.     As another example, on January 17, 2017, Natalie Wu emailed Mark Harrison a photograph of a check written from Serendipity Business Solutions LLC check from Chase bank account ending in 5225 made payable to Carolina Seafood in the amount of $2,345 dated January 10, 2017 for "Phoenix Fisheries #004." In the photograph next to the check was an invoice #004 from Phoenix Fisheries with an address of Target Location 19 that was billed to Carolina Seafood for shark fins.

34

Following the invoice in the picture was an envelope for the check to be mailed to Carolina Seafood with a return address of Mark Harrison, Target Location 19.

77.     Based on my training and experience and this investigation through indictment, I believe that Terry and Natalie Wu through Serendipity Business Solutions, rather than Mark Harrison and Phoenix Fisheries, were paying for shark fins to be shipped to Shun Fat in Hong Kong, in violation of California and federal law.

78.     The Wu TCO continued to use emails to communicate in 2020.  Email communication between an undercover agent (UC) and Mark Harrison in January 2020 revealed Harrison (Target location 19 and 20) and Serendipity Business Solutions, through Chase account ending in 5225, have continued to trade in shark fins in violation of California law by the use of wires to conceal or disguise the ownership, the control of the property and the proceeds, and to defraud others to benefit the WU TCO.

79.     For example, on January 13, 2020, the UC received an email from Mark Harrison (mhfinman@aol.com).  Harrison wrote in part, "...Here is the address for you to sell your shipment directly to HK."  Harrison provided the UC with the business name of the Shun fat Sea Product Trading Company and an address for the company in Hong Kong.  The UC was never paid directly from Hong Kong.  Instead, the UC received payment from the Serendipity Business Solutions Chase account

ending in 5225. Chase records have Target Locations 1 and 2 as the address for this bank account.

80.     As another example, in February 2020, Mark Harrison sent an email to Terry Wu and gave Terry Wu the name of the undercover company and undercover bank account the UC used for Terry Wu to pay for the shark fin shipment to Hong Kong.

81.     Based on this entire investigation and my training and experience, I believe the Wu TCO created Phoenix Fisheries, LLC, a front seafood company in Florida (Target Locations 19 and 20), to hide the unlawful shark fin business it conducts through Serendipity Business Solutions in California (Target Locations 1-3). The Wu TCO hides its unlawful shark fin business by using fake invoices and paperwork representing Target Locations 2  to make it appear that Phoenix Fisheries in Florida (Target Locations 19 and 20) was invoicing and financing the shark fin business. However, the Wu TCO is using Serendipity Business Solutions (Target Locations 1-3) to actually finance and control the shark fin business.

**The Wu TCO Connection to Drug Trafficking and Mexican Cartels**

82.     From review of financial records and other items, investigators believe the Wu TCO is not only engaging in unlawful wildlife trafficking of shark fins, but is also involved in international drug trafficking, international money laundering, and international wildlife trafficking of sea cucumbers. Financial documents show

that Serendipity, in California, and Shun Fat Seafood Product Company, in Hong Kong, also conduct business with Velazquez Seafood International, LTD, in Mexico, a company associated with drug cartels that operate in Mexico and elsewhere and are involved in largescale drug trafficking, money laundering, and wildlife trafficking.  Financial documents and undercover operations outlined below further show that the Wu TCO traffics shark fins and sea cucumbers from Mexico on behalf of Eduardo Beltran Gomez, an associate of another drug cartel operating in Mexico and elsewhere.

83.    Financial documents also reveal that Shun Fat Seafood opened a Wells Fargo bank account ending in 3322 with Target Location 2 as the business address. Terry Wu, Tony Wu, and Simon Bowie Liu are signors on the bank account. According to California secretary of state records, Shun Fat Seafood was incorporated in 2019 with a business address of Target Location 2.  Terry Wu is the chief financial officer, Simon Bowie Liu is the chief executive officer, and Tony Wu is the registered agent for Shun Fat Seafood.

84.    On January 5, 2020, Simon Bowie Liu, possessed 100 pounds of marijuana discretely packaged in totes during a traffic stop in Arkansas.  During the traffic stop, Simon Bowie Liu explained that he was in a wholesale seafood business and was traveling to make some deals.  Simon Bowie Liu further explained that his company was called, "Hummingbird Trading." Before the marijuana was discovered, Simon Bowie Liu said "the company" asked him to bring the totes.  After the

37

marijuana was discovered, Simon Bowie Liu explained that he was actually transporting marijuana from California to Virginia.

85.     During this investigation, Terry Wu traveled to Mexico, and law enforcement searched Terry Wu's cell phone when he returned to the United States. Agents observed a text message conversation in March 2019 between Terry Wu and an associate concerning the company Hummingbird. In the text messages, Terry Wu said, "But now the company has been restructure to Shun Fat Seafood." "Not hummingbird anymore." Terry Wu further said that Hummingbird belongs to Simon. Based on my training and experience and this entire investigation, I believe that the Hummingbird company used for drug trafficking is also Shun Fat Seafood at Target Location 2 and is used by the Wu TCO for drug trafficking.

86.     As part of this investigation, agents obtained a commercial invoice from Serendipity to Shun Fat with the business address of Target Location 3 for Serendipity. A search of Terry Wu's cell phone revealed that on January 17, 2017, Woonjin Lam and Terry Wu communicated through WhatsApp. In the conversation, Woonjin Lam showed Terry Wu multiple photographs of fish bladders, sea cucumbers, and operations in Mexico. Terry Wu then sent Target location 3 for Woonjin Lam to meet him in the office.

87.     Based on my training and experience and this entire investigation, I believe that Terry Wu and his conspirators launder money for a number of criminal organizations, including Asian organized crime and Mexican cartels as outlined

herein. I further believe that Terry Wu took over business from Allen Leung after his murder. I further believe that Mark Harrison is conducting illegal trafficking at Target Locations 19 and 20 at the direction of Terry Wu and Serendipity Business Solutions operating out of Target Locations 1-3 and supplying shark fins to Shun Fat Seafood Products Trading Company in Hong Kong in violation of California and federal law. I further believe that Target Locations 2 and 3 are used as business addresses for Serendipity Business Solutions and Shun Fat Seafood Company in furtherance of the Wu's TCO illegal money laundering conspiracy connected to drug trafficking and wildlife trafficking conspiracy.

## TARGET LOCATIONS 4-6

88.    Based on this entire investigation and my training and experience, I believe the Wu TCO uses Target Locations 4-6 in furtherance of its drug trafficking business. Target Location 4 is Woonjin Lam's residence. Target Location 5 is another residence associated with Woonjin Lam. Target Location 4 is across the street from Target Location 5. Target Location 6 is the residence of Ying Le Pang.

89.    Agents also interviewed Confidential Source #1[1], hereinafter referred to as "CS #1," who was involved in the distribution of hundreds of pounds of

---

[1] CS #1 has provided information to law enforcement personnel that has been checked and corroborated to the extent possible and practical. Based on this corroboration, it has been determined that CS #1 is a reliable source. CS #1 is providing information

marijuana from California to Georgia and elsewhere. CS #1 helped agents identify Woonjin Lam, an associate of Terry Wu. CS #1 told agents that Lam previously supplied him/her with significant quantities of marijuana from California to Georgia through the United States Postal Service. Postal records corroborate the multiple mail shipments of packages consistent with marijuana being shipped to the source through the mail. CS #1, who is currently on probation for drug trafficking, agreed to cooperate. CS #1 explained that Woonjin Lam is responsible for distributing thousands of pounds of marijuana on behalf of the organization.

90.    A review of Terry Wu's cell phone from the search of his phone verified Wu's contacts with members of drug cartels, Woojin Lam, and others members of the Wu TCO.

91.    In November 2018, CS #1 allowed agents to conduct a consensual wiretap on his/her phone. With that phone, CS #1 contacted Woonjin Lam to coordinate the shipment of marijuana from California to Savannah, Georgia. Agents then conducted several undercover operations, conducted physical surveillance, and

---

to law enforcement for money and for assistance with his/her criminal drug charges. CS #1 has multiple felony convictions, including the sale and distribution of marijuana.

identified additional associates of the Wu TCO and locations used by the Wu TCO in furtherance of its criminal enterprise as outlined in more detail below.

92.    On December 6, 2018, agents made a surveilled and controlled delivery of $4,200.00 of government money to purchase marijuana from Lam in California. Ying Pang, one of Lam's associates, took possession of the money at Pang's residence located at 18002 Via Arroyo, San Lorenzo, California, Target Location 6. During the surveillance two separate vehicles were observed arriving at Target Location 6, removing black trash bags that appeared to be almost full from their vehicle and taking the trash bags into the garage of the residence. Lam thereafter shipped samples of his marijuana (1523.7 grams) to Savannah, Georgia, which was seized by postal inspectors.

93.    I believe that the black trash bags contained amounts of marijuana that were transported to Target Location 6 for the purpose of being packaged for distribution to marijuana distributors supplied by Lam and Pang.

94.    After the controlled purchase, Woonjin Lam inquired when CS #1 wanted to purchase a larger quantity of marijuana.

95.    On February 20, 2019, USFWS, USPIS, DEA Oakland, and DEA Savannah successfully conducted a joint operation involving surveillance and a controlled delivery of a USPS package containing $35,000.00 USC in exchange for a 25 pound marijuana delivery to Savannah, Georgia, that CS #1 and Woonjin Lam agreed to. The $35,000.00 USC was delivered to Target Location 6. During

41

surveillance of Target Location 6, agents observed three different vehicles arrive and take bags from their vehicles into the garage. One vehicle removed black bags, one vehicle removed a clear bag, and the third removed a white bag.

96.     On February 21, 2019, Lam was observed driving a 2016 Tesla SUV displaying California license plate – 7WCL282, registered to Terry WU at Target Location 1, after walking out of Target Location 4 and walking across the street to Target Location 5, where Lam drove away using Terry Wu's Tesla SUV. Agents continued surveillance on Lam as well as Target Location 6. Ultimately, Lam was observed parked in front of Target Location 6 using Terry Wu's Tesla SUV. After leaving Target Location 6, agents maintained surveillance on Target Location 6. Pang was observed leaving and returning with a Home Depot box. Pang took the Home Depot box into the garage of Target Location 6 and a short time later was observed leaving Target Location 6 with the Home Depot box. Pang drove to the United States Post Office in San Lorenzo, California, and took the Home Depot box inside. Pang mailed the box to Savannah, Georgia. USPIS seized the box at the post office and had the box securely sent to Savannah, Georgia. The Home Depot box was turned over to me at the DEA Savannah RO and contained 25 packages of marijuana totaling approximately 12,739 grams of marijuana.

97.     I believe Pang used Target Location 6 to receive funds for the purchase of marijuana from Pang and Lam and turned a portion of the funds over to Lam on February 21, 2019, when Lam was observed at the residence. Furthermore, I believe

Pang received marijuana from suppliers at his residence and packaged the 25 packages of marijuana inside the residence prior to transporting the marijuana to the United States Post Office to be mailed to Savannah, Georgia.

98.    Based on my training and experience and this entire investigation, I believe that The Wu TCO, including Woonjin Lam and Ying Le Pang, use Target Locations 4-6 in furtherance of its drug trafficking and money laundering business.

## TARGET LOCATIONS 7-9

99.    Based on this entire investigation and my training and experience, I believe the Wu TCO uses Target Locations 7-9 in furtherance of its unlawful drug trafficking business.  Target Locations 7-9 are warehouses used to store and cultivate marijuana for distribution.  Target Locations 7-9 are all located within an approximately three mile radius.

100.   On August 16, 2019, CS #1 met with Ying Le Pang and Woonjin Lam at Target Location 6.  Woonjin Lam explained that the organization had a 20,000 square foot warehouse for its marijuana business and Woonjin Lam was trying to get additional warehouses.

101.   On August 7, 2020, CS #1 met with Ying Le Pang at Target Location 7. Prior to that meeting, DEA agents provided CS #1 with a cell phone equipped with a live feed so agents could monitor the meeting.  During the meeting, Ying Le Pang told CS #1 that the organization was using Target Location 7 to store and cultivate marijuana plants for distribution.  CS #1 also recorded and agents observed a large

43

number of marijuana plants inside Target Location 7.  CS #1 advised agents that there were approximately 1000-1500 marijuana plants at Target Location 7.

102.    A review of Terry Wu's cell phone from the search of his phone revealed a plumbing repair receipt for Target Location 8.  In addition, Terry Wu was texting a plumber concerning a plumbing repair bill for Target Location 8.

103.    Based on this entire investigation, agents located Target Location 9 as the third warehouse used by the Wu TCO based financial records.  Target Location 9 is associated with GREEN W LLC, a business registered to Terry Wu and Weichuan Liu through bank records.

104.    On August 5, 2020, agents went to Target Locations 8 and 9 and smelled an overwhelming odor of marijuana coming from Target Locations 8 and 9.

105.    Agents also reviewed official records with the City of Oakland and the State of California to determine if Target Locations 7-9 were lawful grow operations for the state of California.  As of August 14, 2020, no permits or official business documents were issued for Target Locations 7-9 authorizing the grow operations in California.

106.    Based on my training and experience and this entire investigation, I believe that The Wu TCO, including Terry Wu, Woonjin Lam and Ying Le Pang, use Target Locations 7-9 in furtherance of its drug trafficking and money laundering business.

## TARGET LOCATIONS 10-11

107.   Based on this entire investigation and my training and experience, I
believe the Wu TCO uses Target Locations 10-11 in furtherance of its unlawful
wildlife trafficking and money laundering business.   Target Location 10 is the
residence of Billy Chen.   Target Location 11 is a business address listed for QBC
International, Inc. on paperwork filed with the USFWS for the importation of sea
cucumbers from Mexico and USFWS import export license for Target Location 3.
Billy Chen is the incorporator, chief executive officer, secretary, chief financial
officer, and agent for QBC International, Inc.   According to records with the
California Secretary of State, QBC International, Inc. is a California company
engaged in the import and export business.   Billy Chen's home address, Target
Location 10, is listed as an address for QBC International.

108.   As part of this investigation, agents identified Billy Chen as an
associate of Terry Wu and involved in wildlife trafficking and money laundering.
The entire investigation identified Billy Chen as an importer, supplier, and
transporter of shark fins and sea cucumbers operating from Target Locations 10 and
11.

109.   Agents connected Billy Chen directly to the Wu TCO through a phone
analysis and seafood purchases from Mexican cartel member Beltran Gomez and toll
records for Terry Wu and Woonjim Lam.   USFWS conducted undercover operations

involving Billy Chen and Beltran Gomez. Target locations 10 and 11 have been involved in multiple shipments of sea cucumbers through Lalo to Chen from Mexico the United States or Hong Kong during the current investigation.

110.   The investigation revealed that Eduardo Guadalupe Beltran Gomez, a/k/a, "Lalo," Billy Chen (QBC International), and others have devised schemes for the purpose of obtaining and dealing in property (seafood) and money (proceeds) through false and fraudulent pretenses or representations. The schemes involve the use of wires to conceal or disguise the nature, the location, the source, the ownership, the control of the property and the proceeds or to defraud others.

111.   In the current investigation, Chen has listed Target Location 3 on USFWS Import / Export License applications and issued licenses. Chen has also facilitated the importation at least forty shipments of sea cucumbers from Mexico, Honduras and Nicaragua, all high-risk jurisdictions for trade-based money laundering, to Target Location 11 to support the Wu TCO.   Several of these shipments were exported from Mexico through Lalo along with false documents.

112.   Based on this entire investigation, I know that Billy Chen, owner of QBC International, frequently travels to Mexico for and with Terry Wu to source shark fins and sea cucumbers from Lalo and others to distribute in the United States and Hong Kong.

113.   A review of Terry Wu's cell phone indicates that between September 16, 2018 and October 26, 2018, Terry Wu and Billy Chen used WhatsApp to communicate and conduct fraudulent transactions concerning the sale of sea cucumber in the amount of $571,245 and involve money flows between the United States, Mexico, Hong Kong, and China in 2018. I note that there has been no season for the species of sea cucumbers involved in this transaction in Mexico for the last ten years.

114.   Through WhatsApp, Wu and Billy Chen communicate about wire transfers concerning their personal domestic bank accounts and the business accounts of QBC International, with an address noted at times as Target Location 10, Serendipity, with an address of Target Location 1, and Shun Fat Sea Product Trading Company though its Hong Kong address. In the communications, Wu and Chen reference QBC International with an address of Target Location 10.   In addition, Wu and Chen send invoices for QBC International with an address of Target Location 10.   Based on my training and experience and this entire investigation, I believe that Wu and Billy Chen communicated on WhatsApp about fraudulent wires to conduct wildlife trafficking and obtain sea cucumbers and shark fins involving Target Locations 10 and 11, all to conceal or disguise the nature, the location, the source, the ownership, the control of the property and the proceeds or to defraud others.

115. In addition, in October and November 2019, Lalo, Billy Chen, and others again devised a scheme to involve the use of third party bank accounts and false documents to conceal the source of illegal product, hide the proceeds and possibly avoid paying taxes due in Mexico. Specifically, Lalo and others received financial transactions from the United States to sell property (sea cucumbers) through false and fraudulent pretenses through a purchase of 1,000 kg of illegal sea cucumbers [*Holothuria floridana*]. There has been no legal season for *Holothuria floridana* in Mexico for an extended period of time and export is prohibited.

116. In Mexico, there is only one species of sea cucumber legal to harvest during limited quota seasons, which usually last 2 weeks [*Isostichopus badionatus*]. Illegal harvesting continues throughout the year and once the product is dried, a few sources of supply have connections within government officials to get paperwork [through payment by an alleged bribe] to make the product appear as it was harvested during an open period and was being sold as "stored product." As part of this investigation, undercover agents have paid for two of these illegal invoices obtained from Lalo through other associates.

117. In October and November 2019, Lalo was the source of the illegal product, false documents, and payments allegedly made to Mexican officials to export the illegal product. Undercover agents purchased 1000 kg from Lalo for $70,000. Using WhatsApp, another conspirator directed undercover agents to make

payment to Lalo through QBC International, with an address of Target Location 10. The undercover agents paid for the product up front, which included the fees necessary for Lalo to allegedly bribe customs for a safe exit. The product was exported from Mexico around November 1, 2019 and received in Hong Kong on or about November 5, 2019. Based on my training and experience and this entire investigation, I believe that the Wu TCO, including Billy Chen and Lalo, communicated on WhatsApp about fraudulent wires concerning Target Locations 10 and 11 to conceal or disguise the nature, the location, the source, the ownership, the control of the property and the proceeds or to defraud others.

118.   As another example, in December, 2019 Lalo and others received financial transactions from the United States and likely Hong Kong and defrauded others of property (sea cucumbers) and proceeds through a purchase of 2,970 kg of illegal sea cucumbers. As noted above, there has been no legal season for *Holothuria floridana* for an extended period of time and export is prohibited.

119.   Undercover agents have paid for two of these illegal invoices obtained from Lalo and others. Lalo was the source of the illegal product, false documents, and payments made to Mexican officials to insure no action was taken against the illegally harvested sea cucumbers upon harvest, processing, and export from Mexico to Hong Kong. USFWS undercover agents negotiated a price of $40 / kg with Lalo through others for a buyer in Hong Kong for the amount of $118,880.

120. Lalo agreed to the price only if the undercover would provide the $25,000 necessary to allegedly bribe to Mexican Customs officials to export the product out of Mexico without seizure. Through the negotiations, Lalo ultimately arranged to deliver the product to the Shun Fat Product Trading Company because the undercover or the other Hong Kong buyer would not pay for the product up front. Undercover agents arranged for a buyer to go to Shun Fat Sea Product Trading CO to inspect the sea cucumbers, pay for the product through the undercover agents, who would in-turn pay Lalo, and facilitate transport. Upon arrival, and subsequent effort to obtain the product, the Shun Fat Sea Product Trading CO refused to release the product and sold the product to another buyer. Lalo never returned the $25,000 payment (bribe money) to the USFWS undercover agents. Lalo said he would credit the $25,000 towards a shipment of shark fins to the United States which never happened. The communication again took place over WhatsApp. Based on my training and experience and this entire investigation, I believe that the Wu TCO, including Billy Chen and Lalo communicated on WhatsApp, telephonically or in person, about fraudulent wires to conceal or disguise the nature, the location, the source, the ownership, the control of the property and the proceeds or to defraud others.

121. Thus, based on this entire investigation and my training and experience, I believe the Wu TCO uses Target Locations 10-11 in furtherance of its unlawful wildlife trafficking and money laundering business.

## TARGET LOCATIONS 12-15

122. Based on this entire investigation and my training and experience, I believe the Wu TCO uses Target Locations 12-15 in furtherance of its money laundering conspiracy. Target Location 12 is a residence of Wu TCO member Heather Luu. Target Location 12 is also the address listed for multiple business entities used by Heather Luu and the Wu TCO for trade-based money laundering. Target Location 13 is a jewelry business used by Heather Luu and the Wu TCO for trade-based money laundering and fake invoices. Target Locations 14 and 15 are the business addresses for Ohansons, LLC and both locations are in the California Jewelry Mart commercial building. Target Location 14 is on the fifth floor, and Target Location 15 is on the ninth floor. Target Locations 14 and 15 are connected to bank accounts used by the Wu TCO for trade-based money laundering.

123. From the undercover operations involving Woonjin Lam, agents learned that Lam is aiding the Wu TCO with the money laundering operation along with the distribution of narcotics. Heather Luu and Lam Phuoc Quang have also been identified as money launderers for the Wu TCO and criminal associates of Lam and Wu.

124. In August 2019, Woonjin Lam introduced CS #1 to Heather Luu. As a result of this introduction, CS #1 was able to introduce a DEA undercover agent (UC) to Luu. Luu was made to believe that the UC was a money launderer for a Drug

Trafficking Organization (DTO) which distributed bulk quantities of cocaine in the United States and elsewhere. Luu was made to understand that the UC needed assistance which laundering bulk currency derived from the cocaine sales. In August, September, and October 2019, the UC conducted multiple successful reverse money laundering operations with Luu in Los Angeles, California. In January 2020, the UC conducted a reverse money laundering operation in Savannah, Georgia with Luu and Quang. These reverse money laundering operations involved bank accounts associated with Target Location 13.

125.   In August of 2019, UC contacted Luu and arranged to meet Luu in the Los Angeles area. DEA and USFWS agents traveled to Los Angeles, California, with $100,000.00 DEA Official Advanced Funds, to meet with Luu, deliver the money to Luu, and have Luu launder the money back to UC via wire transfer minus a 6% commission fee. During the meeting, Luu introduced Elias Castellanos to the UC. Luu and Castellanos talked to UC about marijuana farming, making sure UC's bank account was a business account, and also talked about Luu exporting marijuana to Vietnam. Luu ultimately laundered and wired $94,000.00 United States Currency back into the DEA UC bank account from a business account, Colwort Inc.

126.   On 9/4/2019 Colwort Inc. wire transferred $94,000 to a DEA UC account from the Colwort US Bank account #157519206948. Prior to sending the transfer, the Colwort account was funded by a $150,500.00 deposit on 8/28/2019. The deposit was made up of Rainbow Way Trucking Inc. check #1010 in the amount of

$80,000.00 and S&T US Inc. check #2368 in the amount of $70,500.00 both from US Bank accounts. Xinzhong Yan is a signer on the US Bank account of S&T US INC. account # ending in 3336. Xinzhong Yan also signs the check #1010 from Rainbow Way Trucking Inc.

127.   On 1/9/2020 S&T US Inc. wired $70,000.00 directly to a DEA UC account.

128.   In September of 2019, the UC arranged to deliver $200,000.00 DEA Official Advanced Funds to Luu. During the meeting, Luu introduced Lam Phuoc Quang to UC. Quang took possession of the $200,000.00 bulk cash from UC, and Luu laundered and wired two separate wire transfers in the amounts of $99,000.00 and $89,000.00 back into the DEA UC bank account from business accounts, Jeans Jewelry Inc. (Target Location 13) and Colwort Inc.

129.   The wire transfer in the amount of $99,000.00 was sent directly from the Jeans Jewelry account 690856716 at Chase Bank on 9/23/2019, with an address of Target Location 13. On 9/23/2019, Jeans Jewelry had received a transfer from Ohansons LLC (Target Locations 14 and 15) in the amount of $97,157.30. The wire transfer in the amount of $89,000.00 was sent from the Colwort Inc. account #157519206948 at US Bank on 9/23/2019 after Colwort received a wire transfer on 9/20/2019 in the amount of $99,000.00 from the Jeans Jewelry (Target Location 13) account 690856716. On 9/19/2019, Jeans Jewelry (Target Location 13) had received

a transfer from Ohansons LLC (Target Locations 14 and 15) in the amount of $240,642.75.

130.   Agents learned that Quang was the subject of a separate HSI investigation in 2017 when Quang was found to be in possession of approximately 1.7 million United States Currency during a traffic stop in Meridian, Mississippi. Quang was interviewed and stated that he was taking the money from Atlanta, Georgia, to Los Angeles, California, and would be paid $10,000.00.   The United States Currency was seized by HSI, and Quang was not criminally charged.

131.   In October of 2019, the UC arranged to deliver $200,000.00 DEA Official Advanced Funds to Luu.   During the meeting, Luu was accompanied by Castellanos.   Castellanos took possession of the $200,000.00 bulk cash from the UC, and Luu laundered and wired one wire transfer in the amount of $188,000.00 back into the DEA UC bank account from a business account, Primus Pharma Inc.

132.   On 11/4/2019, $188,000.00 in laundered funds was wire transferred from Primus Pharma Inc. account #000157519207763 at US Bank.   On 11/1/2019, the Primus Pharma account received a wire transfer of $198,000.00 from Jeans Jewelry account #690856716 at Chase Bank (Target Location 13).   On 10/28/2019, Jeans Jewelry (Target Location 13) received a transfer from Gary Austin in the amount of $152,500.00 and on 10/25/2019 a transfer from Ohansons LLC (Target Locations 14 and 15) in the amount of $193.414.40.

133.   In December of 2019 and January of 2020, the UC communicated with Luu regarding Luu traveling to Savannah, Georgia, to pick up $500,000.00 DEA Official Advanced Funds from UC to be laundered.  In January of 2020, Luu and Quang traveled to Savannah, Georgia, where they met with the UC at an undercover U.S. Fish and Wildlife warehouse located in Savannah, Georgia.  The UC turned over $500,000.00 bulk currency to Luu and Quang.  Luu and Quang ultimately transported the $500,000.00 bulk currency back to Los Angeles, California by driving different rental vehicles.  Luu successfully laundered the $500,000.00 United States Currency for the UC through multiple wire transfers, teller transfers, and bulk currency money pickups to be returned to the UC minus 10% commission fee.  The following is a list of wire transfers conducted to launder the bulk currency for the UC:

a.  January 9, 2020, $70,000.00 United States Currency wired back into DEA UC Account from business account, S&T U.S. Inc.  Xinzhong Yan is a signer on the US Bank account of S&T US INC. account number ending in 3336. Xinzhong Yan also signs the check #1010 from Rainbow Way Trucking Inc.  On August 28, 2019, Colwort Inc. deposited checks from S&T US INC for $70,500.00 and $80,000.00 from Rainbow Way Trucking, then on September 4, 2019, wires $94,000.00 to a DEA UC account.

b.  January 13, 2020, $198,000.00 United States Currency wired back into DEA UC Account from business account, Jeans Jewelry Inc, (Target Location 13).

The funds were wire transferred directly from Jeans Jewelry account #690856716 at Chase Bank on January 13, 2020 and on the same day Jeans Jewelry (Target Location 13) received a transfer from Ohansons LLC (Target Locations 14 and 15) in the amount of $249,323.25.

      c. February 6, 2020, $16,670.00 United States Currency wired back into DEA UC Account from Community Choice Credit Union personal account of Anthony E. Gatliff. Gatliff also wrote check #1542 on January 20, 2020 to the North Star Consulting account of Heather Luu in the amount of $16,667.00.

      d. February 19, 2020, $80,000.00 United States Currency wired back into DEA UC Account from business account, Jeans Jewelry Inc. (Target Location 13). The funds were wire transferred directly from Jeans Jewelry (Target Location 13) account #690856716 at Chase Bank. Luu showed the UC a fake invoice for 51 ounces of 24k gold for $80,000.00 purportedly from Jeans Jewelry (Target Location 13.) for this transaction.

      e. February 25, 2020, $72,315.00 United States Currency transferred back into DEA UC Account from business account, Trinity Consulting Group LLC. On February 25, 2020, Terry Shook (Target Location 18) and Trinity Consulting (Target Location 18) conducted a Bank of America interbank transfer in the amount of $72,315.00 from his Trinity Consulting account #375000418408 to a Bank of America UC account ending in 6793. The address on the account is Target Location 18.

134.   On February 26, 2020, Luu was stopped by local law enforcement in Grand Junction, Colorado.   Luu and Kevin Nguyen were in the vehicle, and $170,640.00 USD was seized from Luu along with cellphones belonging to Luu and Nguyen.   Luu stated she got the money from Terry and provided Terry's phone number from her cell phone.   The office located a jewelry receipt that showed Luu sold 129 ounces of 24 karat gold.   It should be noted that the Jean's Jewelry Inc. (Target Location 13) receipt for the 129 ounces of 24 karat gold stated it was paid by wire into a DEA UC account.

135.   I also note that while receiving location data from AT&T for Heather Luu's cell phone with phone number 714-307-4178 pursuant to a Federal Search Warrant issued in the Southern District of Georgia, Luu was located at Target Location 18 on January 31, 2020, and February 25, 2020.   Target Location 18 is Terry Shook's address.

136.   On March 17, 2020 from the same Bank of America account #375000418408, Trinity Consulting (Target Location 18) writes check #1606 for $10,000.00 to North Star Consulting with note for Masks and check #1607 for $10,000.00 to Primus Pharma with note for Masks.   Primus Pharma and North Star Consulting are controlled by Heather Luu and Primus Pharma is connected to Target Location 12.

137.   On November 12, 2019 from the same Bank of America account #375000418408, Trinity Consulting (Target Location 18) wire transferred $7,000.00

to Elias Castellanos who has assisted Heather Luu in picking up funds to be laundered.

138. Between January 9, 2020 and February 25, 2020, when Luu was laundering the $500,000.00 United States Currency for the UC, several events related to the investigation occurred. Luu told the UC that US Bank closed all of her accounts after Luu tried to send a wire transfer in the amount of $182,000.00 on January 14, 2020. I believe the closure of Luu's accounts at US Bank was a major factor in Luu taking more than two months to launder the $182,000.00 United States Currency. Luu's communications with the UC indicated that Luu was nervous and being cautious with her financial transactions.

139. Also, in March 2020, the remaining United States Currency owed to the UC, approximately $13,015.00,was returned through bulk currency pickups from Kevin Nguyen near Atlanta, Georgia. On March 5, 2020, Nguyen turned over $10,000.00 United States Currency to a DEA UC. On March 18, 2020, Nguyen turned over $3,020.00 United States Currency to a DEA UC, which was $5.00 more than owed.

140. After receiving the final $3,020.00 United States Currency from Nguyen on behalf of Luu, Luu had successfully laundered $450,005.00 United States Currency for the UC, of which $436,985.00 United States Currency was electronically transferred via wire transfer or teller transfer back into undercover DEA bank accounts utilized during this investigation.

58

141.   Agents also learned that while Luu was laundering the $500,000 for DEA, she was staying at Target Location 12.  Agents learned this from location data from AT&T for Heather Luu's cell phone with phone number 714-307-4178 pursuant to a Federal Search Warrant issued in the Southern District of Georgia.  Between January 2020 and March 2020, Luu was located at Target Location 12 almost every day, indicating that she was staying at Target Location 12 during this time.  I note that while Luu's cell phone was at Target Location 12, she communicated with the UC concerning the laundering the $500,000.  Thus, based on this entire investigation and my training and experience, I believe that Luu used Target Location 12 to facilitate money laundering conspiracy on behalf of the Wu TCO.

142.   Bank records show that between January 3, 2017 and January 31, 2020, Jeans Jewelry account #000000690856716 had total deposits of $51,101,036.49.  During the same period, Jeans Jewelry received $21,876,972.69 from Ohansons LLC and sent $11,949,043.68 to Ohansons LLC.  In 2019, Jean's Jewelry's total deposits were approximately $22,000,000.00, of which $14,610,599.21 came from Ohansons LLC.  Prior to the period covered by the bank records, Fedwire records show that in 2015 and 2016 Ohansons LLC wired Jean's Jewelry $706,182.80 in 2015, $4,988,651.38 in 2016 and Jean's Jewelry wired Ohansons LLC $7,802,005.91 in 2015, $5,620,945.55 in 2016.  Bank and Fedwire records combined to show that from 2015 through January of 2020 Ohansons LLC sent Jean's Jewelry $27,571,806.87 and Jeans Jewelry sent Ohansons LLC $25,371,995.14.

143.   DEA agents interviewed Cooperating Source #2[2] (CS #2) who provided information regarding Ohansons, LLC.  CS #2 said that he/she has worked in the jewelry industry for many years and has extensive knowledge about illegal activity being conducted by several Los Angeles based companies.  CS #2 said that Viken Ohanian is the owner of Ohansons, LLC, a gold business located in a jewelry mall at 607 S Hill St, Los Angeles, CA (Target Locations 14 ad 15).  CS #2 said that Ohanian, his sister Arousiag Ohanian Hanna, and her husband Tanios Hanna are the primary individuals involved in the business, and that Ohansons' launders illicit proceeds through the buying and selling of precious metals, specifically gold.

144.   CS #2 said that Viken Ohanian, operating in his role at Ohansons, receives bulk cash from individuals involved in illicit activity including marijuana trafficking (hereafter "customer") and sells the customer gold bars.  CS #2 explained that Ohanian charges the customer the current gold price plus a $40-50 per ounce markup resulting in a $1,400 to $1,700 profit per kilogram of gold.  According to CS #2, the customer then sells the kilograms of gold to another business in the same business complex which is also owned by Ohanian or associated with Ohanian.  With

---

[2] CS #2 has provided information to law enforcement personnel that has been checked and corroborated to the extent possible and practical.  Based on this corroboration, it has been determined that CS #2 is a reliable source.  CS #2 is providing information to law enforcement for money.  It is my understanding that CS #2 does not have any felony convictions.

the sale of the bars, the customer has legitimized his illicit proceeds less an approximate 2.6% charge.

145.    CS #2 stated that Ohanian receives bulk cash from customers, which he subsequently uses to personally purchase bars of gold and then returns the money back to the customer in the form of a check or a wire transfer. In this event, Ohanian sells the gold to his gold buyer for the current cost of gold plus $3 per ounce resulting in another small profit. Based on my training and experience and this entire investigation, I believe that the Wu TCO use Ohansons, LLC at Target Locations 14 and 15 for trade-based money laundering.

146.    Bank records for Jeans Jewelry lists Target Location 13 as its address. Target Location 13 is a suite located inside the Asian Garden Mall and appears to be a small and modest jewelry business. Target Location 13 does not appear to be a multi-million dollar business and does not appear to have any significant assets. In addition, Target Locations 14 and 15 are business addresses for Ohanson, LLC according to their bank records. Target Locations 14 and 15 are small suites inside the California Jewelry Mart and do not appear to be billion dollar industries. A review of financial records over an 18 month time period showed that in excess of 1 billion dollars United States currency moved through Ohansons LLC bank accounts. In addition, a review of tax returns does not indicate or support that Ohansons, LLC is involved in a billion dollar business. Thus, based on my training and experience and this entire investigation, I believe that Jeans Jewerly (Target Location 13) and

Ohansons, LLC (Target Locations 14 and 15) are front business for trade-based money laundering used by the Wu TCO.

## TARGET LOCATIONS 16-17

147.   Based on this entire investigation and my training and experience, I believe the Wu TCO uses Target Locations 16-17 in furtherance of its money laundering and drug trafficking business.

148.   As outline above, Heather Luu is a member of the Wu TCO that is involved in money laundering. Target Locations 16 and 17 are residences associated with Heather Luu.

149.   In December of 2019 and January of 2020, the DEA UC communicated with Luu regarding Luu traveling to Savannah, Georgia, to pick up $500,000.00 DEA Official Advanced Funds from the UC to be laundered. In January of 2020, Luu and Quang traveled to Savannah, Georgia, where they met with the UC at an undercover U.S. Fish and Wildlife warehouse located in Savannah, Georgia. The UC turned over $500,000.00 bulk currency to Luu and Quang. Luu and Quang ultimately transported the $500,000.00 bulk currency back to Los Angeles, California by driving different rental vehicles. Luu successfully laundered the $500,000.00 United States Currency for the UC through multiple wire transfers, teller transfers, and bulk currency money pickups between January 9, 2020 and February 25, 2020.

150.   Agents obtained a federal search warrant for location information associated with Luu's cell phone to determine her location and activates.  On July 15, 2020, United States Magistrate Judge Christopher L. Ray granted a search warrant for prospective phone location information.  Through the use of this location data, on or about July 28, 2020, DEA agents conducted physical surveillance to locate Luu, who was accompanied by Lam Quang near Atlanta, Georgia.  Agents have identified Target Location 16 and Target Location 17 used by Luu and Quang near Atlanta, Georgia.

151.   Agents were able to determine through the City of Norcross that the utilities for Target Location 17 are in Quang's name.

152.   On January 21, 2020, Quang was arrested by Gwinnett County Sheriff's Office for state charges of trafficking marijuana.  Quang was held at the Gwinnett County Detention Center until he was granted bond.  While incarcerated, Quang and Luu had several conversations, which were recorded by the Gwinnett County Detention Center and reviewed by DEA SA Linh Vuong.  Luu and Quang discussed Luu renting a house near Atlanta, Georgia, to use as Quang's address for the bond, along with Quang needing to obtain a Georgia driver's license.  Agents determined that Quang obtained a Georgia driver's license on 04/25/2020 and used Target Location 16 as his address on the Georgia driver's license.  Target Location 16 is also the address used by Quang when he bonded out of jail.

153.    Based on my training and experience and this entire investigation, I believe that the Wu TCO uses Target Locations 16 and 17 in furtherance of its money laundering business.

## TARGET LOCATION 18

154.    Based on this entire investigation and my training and experience, I believe the Wu TCO uses Target Location 18 in furtherance of its unlawful drug trafficking business.

155.    As outlined above, while investigating Heather Luu, agents identified Terry Shook as a member of the Wu TCO involved in drug trafficking and money laundering.  Luu successfully laundered $500,000 for the UC through multiple wire transfers, teller transfers, and bulk currency pickups to be returned to the UC minus the commission fee.  One of the wires back into the DEA UC Account was on February 25, 2020 in the amount of $72,315.00 United States Currency from business account, Trinity Consulting Group LLC.

156.    On February 25, 2020, Terry Shook (Target Location 18) and Trinity Consulting (Target Location 18) conducted a Bank of America interbank transfer in the amount of $72,315.00 from his Trinity Consulting account #375000418408 to a Bank of America UC account ending in 6793.  The address on the account is Target Location 18.

157.   On February 26, 2020, Luu was stopped by local law enforcement in Grand Junction, Colorado.   Luu and Kevin Nguyen were in the vehicle and $170,640.00 USD was seized from Luu along with cellphones belonging to Luu and Nguyen.   Luu stated she got the money from Terry and provided Terry's phone number from her cell phone.   The office located a jewelry receipt that showed Luu sold 129 ounces of 24 karat gold.   It should be noted that the Jean's Jewelry Inc. (Target Location 13) receipt for the 129 ounces of 24 karat gold stated it was paid by wire into a DEA UC account.

158.   I also note that while receiving location data from AT&T for Heather Luu's cell phone with phone number 714-307-4178 pursuant to a Federal Search Warrant issued in the Southern District of Georgia, Luu was located at (Target Location 18) on January 31, 2020, and February 25, 2020.   Target Location 18, Terry Shook's address.

159.   On March 17, 2020 from the same Bank of America account #375000418408, Trinity Consulting (Target Location 18) wrote check #1606 for $10,000.00 to North Star Consulting with note for masks and check #1607 for $10,000.00 to Primus Pharma with note for masks.   Primus Pharma and North Star Consulting are controlled by Heather Luu and Primus Pharma is connected to Target Location 12.

160.   On November 12, 2019 from the same Bank of America account #375000418408, Trinity Consulting (Target Location 18) wire transferred $7,000.00

to Elias Castellanos who has assisted Heather Luu in picking up funds to be laundered.

161.   During a review of content extracted from Luu's phone pursuant to a federal search warrant in Colorado, which was seized in Colorado on February 26, 2020, I located screenshot images from WhatsApp conversations between Luu and Shook regarding marijuana prices and different strains / quality of marijuana. The WhatsApp screenshots had dates from January 2020 associated with them. There were also pictures of marijuana buds in the WhatsApp conversation screenshots with Shook.

162.   Based on my training and experience and this entire investigation, I believe that the Wu TCO uses Target Location 18 in furtherance of its drug trafficking and money laundering business.

## TARGET LOCATIONS 21-22

163.   Based on this entire investigation and my training and experience, I believe the Wu TCO uses Target Locations 21 and 22 in furtherance of its wildlife trafficking and money laundering business.

164.   Target Location 21 is the wholesale seafood business Greg Abrams Seafood, Inc. Target Location 22 is the wholesale seafood business Phillips Seafood. Based on this entire investigation, I believe Target Locations 21 and 22 supply shark fins to the Wu TCO.

165.   As outlined above, Target Location 19 and Target Location 20 are locations used by Mark Harrison to ship shark fins for the Wu TCO in California to conspirators in Hong Kong.  Target Location 21 and Target Location 22 are seafood dealers that provide the shark fins for Serendipity Business Solutions (Target Locations 1-3) through Phoenix Fisheries (Target Locations 19-20).

166.   In an effort to infiltrate the Wu TCO, agents identified dealers who associate with Mark Harrison.  Greg Abrams is one shark fin dealer identified in Mark Harrison's CITES Export Permit Application.  Greg Abrams Seafood is located at Target Location 21 and is owned by Greg Abrams.

167.   Harrison has exported shark fins from the United States and purchased shark fins domestically and in interstate commerce through the address of Abrams Seafood 234 E Beach Drive, Panama City, FL 32401-3117, Target Location 21, since 2016.

168.   Harrison is required to possess a Florida Department of Agriculture and Consumer Services [FDACS], Division of Food Safety, Food Entity Permit to dry and export shark fins.  Phoenix Fisheries operates under an annual FDACS Food Entity Permit that is issued to Phoenix Fisheries but falsely lists the address of Target Location 21.  Target Location 21 is the business address for Abrams Seafood.

169.   Between March 9, 2016 and May 1, 2018, Harrison, D/B/A Phoenix Fisheries exported fourteen shipments of shark fins to Shun Fat Sea Product

Trading Company in Hong Kong each with a FDACS Certificate of Free Sale, Health and Sanitation, included in the export document package to "…certify that Phoenix Fisheries LLC, 234 E Beach Dr, Panama City, FL 32401-3317, USA has been issued an annual food permit for Food Entity number 361684 by the Florida Department of Agriculture and Consumer Services, and manufactures, distributes and packs various food products for human consumption, that have been freely sold and consumed in the United States of America as well as for export." As evidenced by the issuance of an annual food permit for Food Entity number 361684 Phoenix Fisheries LLC complies with all health and sanitation requirements of the Florida Department of Agriculture and Consumer Services for the manufacturing, distributing and packing of various food products for human consumption and is regularly inspected for compliance with these requirements by representatives of the Florida Department of Agriculture and Consumer Services. The food products in this shipment were manufactured, distributed and packed under these sanitary conditions for international export shipment to the country of Hong Kong."

170.   In total, approximately 24,571 pounds of dried shark fins valued at approximately $819,306 were exported with the fraudulent FDACS Division of Food Safety Certificates from Target Location 21.

171.   On July 30, 2020 a shipment of shark fins was shipped in an undercover capacity to Harrison. Harrison requested to be invoiced and the Bill of Lading be made out to his attention at Greg Abrams Seafood, 234 E Beach Drive, Panama City,

FL 32401 (Target Location 21).   Harrison uses his business relationship with Abrams Seafood to not only conceal from FDACS that Harrison is processing/drying shark fins for export at his residence and property (Target Location 20), but also to conceal from USFWS the actual location that Harrison stored shark fins.  I note that when Harrison applied for and was rejected for a CITES export permit in 2017, that application also listed the address for Abrams Seafood (Target Location 21) as the storage location for the shark fins.

172.   Natalie Wu, in the name of Serendipity, obtained a Fish and Wildlife Import/Export License from USFWS.  The application for the permit was in violation of 18 U.S.C. § 1001.  Applicants are required to list where all places wildlife inventories and records are being kept; however, the application concealed Target Location 20 from records and inventory address requirement.  Instead, the application listed the address for Abrams Seafood at Target Location 21.

173.   Serendipity used the import/export license to obtain a CITES export permit in the name of Serendipity for the same shark fins for which Harrison was denied a permit.  Terry Wu created a commercial invoice from Serendipity to Shun Fat and used the address of Target Location 3.  The CITES export permit was granted and the shark fins were exported to Shun Fat.

174.   Phillips Seafood is another shark fin dealer identified in Mark Harrison's CITES Export Permit Application.  Phillips Seafood is located at Target Location 22 and owned by Charles Phillips.  USFWS investigators also reviewed

financial records for connections between Phillips Seafood and Serendipity. A review of financial records showed that Phillips received four checks totaling over $24,000 directly from Serendipity's business account for the purchase of shark fins. Phillips Seafood with an address of Target Location 22, received a check from Serendipity Business Solution's JP Morgan Chase bank account, ending in 5225, on September 13, 2016, in the amount of $6,676. The address associated with this Serendipity bank account is currently Target Location 2, but at the time referenced the address associated with this Serendipity bank account was Target Location 1.

175.   On February 2, 2018, a UC engaged in a recorded telephone conversation with Charlie Phillips about selling shark fins to Phillips. The UC told Phillips the UC lost his buyer for shark fins and needed to find someone to buy about $40,000 worth of fins.

176.   On February 5, 2018, Mr. Phillips sent the UC a text message that stated: "I have a guy named Eddie that will call you. He works for a company in Canada and I sell them stuff." The same day, Eddie Li called the UC from telephone number left a voice message. In the voice message, Eddie LI identified himself and stated that he was from Starboard Seafood in Toronto, Canada, and stated that Charlie Phillips asked Eddie to call the UC to discuss dried shark fins that were for sale. Li said that he purchased fish from Phillips.

177.   On February 9, 2018, Li told the UC during a telephone conversation that Li showed the photos to a couple of shark fin importers who liked the photos.

Li, therefore, asked for a sample of the fins that consisted of multiple species of sharks and an example of shark fins in a set of four so they could be inspected for dryness, quality and the cuts. Li stated that once the importers inspected the fins, UC and Li could start conducting business. The UC asked Li what species of sharks the importers wanted to inspect. Li replied, "Ah blacktip is fine, hammerhead is fine. The more interesting is the set of four (4)." The UC asked Li how Li wanted to ship the fins. Li told UC to deliver the fins to Charlie Phillips (Target Location 22) to be put on a truck and marked as "fish sample" to distinguish the fins from the amberjack and snapper that Mr. Phillips was already exporting to Li. Li recommended trucking the fins with Mr. Phillips (Target Location 22) to save money. Li said, "I'll talk to Charlie and he will know how to do it, I think." Li instructed the UC to place the fins in plastic bags, mark them as samples, and identify the species. Li said he sent a truck to Phillips Seafood (Target Location 22) every Friday because Phillips Seafood provided Li with seafood products. UC asked Li if there was any paperwork the UC needed to send with the shark fins that is required in Canada. Li replied: "No not really because we don't, we don't declare there. We just put clams, or fish [pause] just put down with the bag [pause] they're sample. That's all, don't have to do nothing." This direction by Li is an example of false labeling and a violation of CITES.

178. On March 28, 2018, Li called UC and ordered approximately 50 pounds of blacktip and hammerhead shark fins. Li told UC to label the boxes as blacktip

and lemon shark. This direction is an example of Li directing UC to falsely label the shipment to avoid CITES requirements. Li told UC that he was going to email UC later listing people he dealt with when buying shark fins. Li said he would send the company names and telephone numbers, but he did not want UC to mention Starboard Seafood when discussing buying shark fins. Li then sent an email to UC listing the following companies: Griffen Seafood, Bryant Products, Safe Harbor, Seafood Atlantic, King Seafood, Safe Harbor. It should be noted that the companies noted in the email have been suspected of being involved in the shark fin trade to support the Wu TCO.

179.   On March 29, 2018, UC delivered approximately 50 pounds of blacktip and hammerhead shark fins to Phillips Seafood (Target Location 22) for export to Starboard Seafood in Toronto, Canada. The boxes were falsely labeled, in accordance with Li's direction, to contain only blacktip shark fins.

180.   On March 31, 2018, UC emailed Li informing him of the actual list of shark fins shipped. UC stated: "Hi Eddie, This is what I shipped: 1. Jumbo Great Hammerhead 24.3lbs. Wrote Jumbo on sets. 2. Jumbo Lemon 4.6lbs. 3. Scalloped Hammerhead 5.8lbs. Just wrote #1 on sets. 4. #1 Blacktip 10lbs. 5. #2 Blacktip 6.5lbs. Li responded to the email and said thanks.

181.   On April 26, 2018, UC spoke to Li. Li requested UC prepare a shipment of lemon, bull and hammerhead dried shark fins. Li asked UC to number each bag, each box and send an email of the actual contents by box and bag. UC confirmed

species would be bagged separately to avoid any confusion. Li instructed UC to itemize all of the shark fins on the invoice as blacktip shark. Toward the end of the conversation, Li told UC to label the contents of the boxes as blacktip or lemon shark to look legal.

182.   On April 28, 2018, UC sent Li an invoice # 2018-033 via fax to 416-752-9129 in the amount of $3,323.10, which falsified the species of dried shark fin as directed by Li to be exported through Phillips Seafood (Target Location 22).

183.   On May 10, 2018, Li called UC and said he wanted 50 pounds each of lemon, tiger and hammerhead shark available to ship later in the week. Li also wanted white (great white) shark fins if they could be located. Li said the fins were going to a very important guy. Li told UC to label the bags inside the boxes as bag # 1, bag # 2 etc. not by species. Li instructed UC to label all of the dried shark fins on the invoice as blacktip sharks & lemon sharks. UC confirmed the availability of the shark fins for each species and added he (UC) did not have any great white shark fins at the time. Li said lemon, tiger and hammerhead were fine for now.

184.   On May 11, 2018, UC faxed Li invoice # 2018-028 for the shipment prepared to be exported at fax # 416-752-9129. As directed by Li, the invoice faxed contained a mislabeled itemization of the species of sharks in the actual shipment. Total invoiced amount for payment was $6,444.40.

185.   On May 12, 2018, UC sent an email to Li, which itemized fins actually exported to Canada. In the email, UC told Li lemon shark fins, tiger shark fins and

hammerhead shark fins were shipped and how each species was packaged. Li responded and said thanks.

186. On June 14, 2018, UC sent an email to Li, which included an itemization and photographs of dried shark fins ready for export to Canada. The following dried shark fins were prepared to ship: Jumbo Sandbar Shark 28.8 lbs., Jumbo Bull shark 13.6 lbs., # 1 Bull shark 7.1 lbs., #1 Scalloped hammerhead 25.9 lbs., # 1 Blacktip 79.2 lbs., # 2 Blacktip 26.7 lbs. Later in the day, UC received a text message from Li at approximately 9:43 PM EST. In the text message, Li wrote, "Please send all those dried Shark fin tomorrow to Philip [sic] thanks."

187. On June 15, 2018, UC prepared the shipping labels for eight (8) boxes of dried shark fins to be exported to Canada. As previously directed by Li, the shipping labels were prepared in a way to mislabel the species of dried shark fins contained in the shipment.

188. On June 15, 2018, UC prepared Invoice # 2018-036 to fax to Li. The invoice totaled $6,591. As previously directed by Li, UC falsified the invoice to conceal the identification hammerhead shark fins and those fins from sharks not normally encountered by Canadian Customs. UC faxed the invoice to Li at 416-752-9129.

189. Between June 15, 2018 and September 9, 2018, I am aware of approximately six shipments of dried shark fins delivered by UC to Phillips Seafood (Target Location 22) in Townsend, Georgia and picked up by Starboard Seafood in

foreign commerce. Li confirmed receipt of each shipment, all of which were in violation of 18 U.S.C. § 554 (a) and § 18 U.S.C. 2 because the shipments were mislabeled at Li's direction.

190.   On September 18, 2018, Li sent UC an email which read in part, "Good day, just meeting with customer talk about the frozen blue shark fin discussion detail as follow: 1/ The markets for the DRIED BLUE SHARK FIN SET OF FOR [SIC] US62.00/KILO 2/ The blue shark fins are not much fins after processing then dried. 3/ They import from South America few Countries now. 4 / THE FROZEN THE PRICE US$20.00/KILO, they buying too. 5/ Let me know what you can sell at?? Thanks."

191.   On September 20, 2018, Li sent UC an email which read in part, "Good day, just finished meeting with 3 customers today: following results: 1/ Need 1/2-1 moon cuts. 2/ Need set of 4. 3/ need 14 inches up. 5/ US$18.00/kilo. If above term agree, will try 500 kilos. After if they like will buy the balance you have. Let me know."

192.   On October 23, 2018, UC sent Li an email and informed him 500kg of frozen blue shark fins were being prepared to ship Friday (October 26, 2018). UC told Li to inform the buyer to be ready to receive the fins. Li responded by email and acknowledged the details for the frozen blue shark fins.

193.   On October 24, 2018, UC sent Li an email and asked what company name needed to be on the shipping label to receive the blue shark. Li replied by

email and wrote, "Good morning, still starboard seafood, same label, don't need put frozen shark fin., just do same as before is ok."

194.   During the course of this investigation Li, Starboard Seafood, and Charlie Phillips through communications with UC, all acknowledge there were no CITES permits authorizing the exportation of the aforementioned species of wildlife from the United States to Canada.

195.   Based on this entire investigation and my training and experience, I believe the Wu TCO uses Target Locations 21 and 22 in furtherance of its unlawful wildlife trafficking business.

## TCO Recordkeeping and Business Practices

196.   Based upon my training and experience, my participation in other drug trafficking and money laundering investigations, and this entire investigation that has spanned five years throughout the United States, Canada, Mexico, and Hong Kong, I know that members of TCOs engaged in wire fraud, mail fraud, international wildlife trafficking, and money laundering very often place their assets in names other than their own to avoid detection of these assets by government agencies;

    a.   even though these assets are in other persons names, the drug dealers, money launderers, wildlife traffickers, and fraudsters continue to use these assets and exercise dominion and control over them;

b. narcotics traffickers and money launderers usually maintain large amounts of US Currency in order to maintain and finance their ongoing narcotics business;

c. drug traffickers, wildlife traffickers and money launderers, often maintain books, records, receipts, notes, ledgers, airline tickets, rental agreements, money orders, and other papers relative to the transportation, manufacturing, ordering, sale and distribution of controlled substances, and like records related to wildlife trafficking, and money laundering;

d. drug traffickers, and wildlife traffickers, commonly "Front" (provide on consignment) controlled substances and wildlife to their clients and keep written records of these transactions, additionally money launders keep written records of transactions;

e. the aforementioned books, records, receipts, notes, ledgers, etc., are usually maintained where the traffickers and money launderers, have ready access to them;

f. it is common for traffickers / dealers to secrete contraband, controlled substances, including marijuana, and even wildlife, proceeds of drug sales and wildlife sales, and records of drug transactions, wildlife trafficking, and money laundering, in secure locations within their residence, businesses, or property for ready access to conceal from law enforcement authorities;

77

g. persons involved in large-scale drug trafficking, wildlife trafficking and money laundering conspiracies, often conceal in their residence controlled substances and records of financial transactions relating to manufacturing, obtaining, transferring, secreting, and/or spending of large sums of money made from engaging in narcotics trafficking activities, and/or wildlife trafficking, and other items of value and/or proceeds of drug transactions, wildlife trafficking and money laundering;

h. when drug traffickers, wildlife traffickers, and fraudsters, amass large amounts of proceeds from the sale of drugs, they often attempt to legitimize or "Launder" these profits, and to accomplish these goals, drug traffickers and wildlife traffickers, utilize, including but not limited to, foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations, safety deposit boxes, and business fronts;

i. drug traffickers, wildlife traffickers, and money launderers, commonly maintain address or telephone books or books or papers which reflect names, address, and/or telephone numbers for their associates in the organization;

j. drug traffickers, wildlife traffickers, and money launderers, take photographs and videos of themselves, their associates, their property, and/or their product and usually keep these photographs in their possession;

k. the courts have recognized that unexplained wealth can be probative evidence of crime motivated by greed, in particular, trafficking in controlled substances, wildlife trafficking and criminal activity in general;

l. drug traffickers, wildlife traffickers, fraudsters, and money launderers maintain computers at their residences and businesses which are utilized to maintain addresses, telephone numbers, records of manufacture, distribution, of transactions, documents and records reflecting names of co-conspirators and clients; and

m. drug traffickers keep firearms and other weapons to protect and facilitate their drug operation, further those tied to organized crime, Mexican and Asian, often possess weapons to protect and facilitate the criminal activity;

n. Members of a long-running transnational criminal conspiracy organization, such as the Wu TCO, routinely store their records, finances, and drug related items as described above in their residences, "stash" houses, business, and warehouses;

o. Members who manufacture and distribute marijuana often maintain warehouses to grow marijuana, and trap houses to store marijuana, as this particular investigation has verified. These warehouses and trap houses utilize tools, including scales, money counters, paraphernalia, packaging materials, lights, seeds, water systems, heat lamps, cellphones, computers, weapons, heat sealers, and money wrappers. Further, those engaged in money laundering conspiracy, as evidenced in

this particular case, often possess large quantities of cash, and need to store the cash, package the cash, and count the cash.

p. Members of large scale drug conspiracies, money laundering conspiracies, and seafood trafficking conspiracies often use equipment to defeat law enforcement investigative techniques, including surveillance equipment, cameras, recording devices, police scanners, radio frequency detectors, and counter-surveillance equipment;

q. Members of conspiracies, including cartels and Asian organized crime, often maintain notebooks, notes, and paper documents regarding members, conversations with members, and transactions, identifying materials, including branding mechanisms, flags, books, photographs and videos;

r. Members of conspiracies of the nature described in the affidavit, possess large quantities of money, foreign currency, precious metals, jewelry, and financial instruments, including stocks and bonds, cashiers checks, money orders, wire transfers, to facilitate the criminal activity;

s. Businesses and homes utilized by conspirators often have documents and items that indicate an indicia of occupancy, residency and/or ownership of the premises, including utility bills, western union receipts, safety deposit box keys, correspondence, bank statements, photos, videos, contracts, and personal and business documents;

80

t. Those engaged in drug trafficking and wildlife trafficking, often maintain records regarding the location of storage houses and locations, stash houses, customers, sources, drugs, wildlife, maritime maps, transportation routes;

u. Those engaged in conspiracies of this nature often maintain at homes, businesses, and stash locations, receipts for items evidencing the expenditure of funds to promote the activity and/or evidencing the expenditure of proceeds from the criminal activity, including the receipts for the purchase of property, real or otherwise, the leasing of property, real and otherwise;

v. Those engaged in organized criminal activity of the nature described in the affidavit often maintain papers related to items used to commit the activity, to conceal the activity, and/or items procured via the activity, including vehicle registration documents, documents related to the ownership or leasing of property, rental vehicles, bank statements, cancelled checks, deposit slips, bank drafts, withdrawal records, safe deposit information and key(s), money orders, cashiers checks, check stubs, letters of credit, wire transfer records, bank statements, passbooks, stock books, certificates of deposit, ledgers, corporate papers, contracts, business licenses, financial investment information, financial registration information, stocks, bonds, letterhead, stationary, business cards, profit/loss statements, books and records of corporations, partnerships (both domestic and foreign), records reflecting the true or beneficial owner of a business, balance sheets,

81

accounting paperwork, deeds, tax records, payment journals, notes, accounts payable, employee ledgers, handwritten notes, computer generated documents, computer records related to transactions, emails, internet searches, and other documents, whether paper, or electronic;

w.      In conspiracies of this nature, members often maintain internal and external correspondence or communications, including notes of conversations, telephone logs and journals, and any other record, electronic or otherwise, evidencing contracts, financial or payment transactions, relations with clients and potential clients, customers and/or associates, and the nature of the business activities engaged by the names and businesses listed in the affidavit and its associates;

x. Because this conspiracy involves wildlife trafficking, in my experience, those engaged in wildlife trafficking often maintain records concerning the possession of wildlife, the storage of wildlife, including the landing of sharks, shark fins, documents related to state, federal laws and international treaties, including correspondence with government agencies, and people within the conspiracy, known and unknown, including fishermen, middlemen, suppliers, harvesters, transporters, and companies that sell and purchase shark fins and wildlife;

y. In my experience, those engaged in wildlife trafficking, often possess the wildlife, including shark fins, trafficking equipment, trafficking materials, Global Positioning Units (GPS) and data related to locations, maps, journals and other

documents including routes waypoints, locations of harvest, collection, purchase, and/or sale of wildlife, bills of lading, shipping invoices, and regulatory documents;

z.  Members of this conspiracy spread throughout the United States and internationally.  In my experience, conspirators often maintain travel receipts, tickets, passports, and other travel related documents and/or records relating to identification of individuals, for example:  visas, passports, resident alien cards

aa.  In my experience, due to the digital age, criminal organizations of this nature often use computers and other electronic devices to share information, to communicate, and to store documents related to shell companies, and criminal activity, including the documents and records outlined herein.

## TECHNICAL TERMS

197.  Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet

service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

      b.    Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

      c.    Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

198. As described above and in Attachment B, this application seeks permission to search for records that might be found on the premises, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

199.    *Probable cause.* I submit that if a computer or storage medium is found on the premises, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.      Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system

85

configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e.     Based on actual inspection of other evidence related to this investigation, such as financial records, business records, invoices, CITES applications, bills of lading, list of wildlife suppliers and purchasers, mailing records, email communications, and text messages, I am aware that computer equipment was used to generate, store, and print documents used by this organization to commit the Target Offenses. There is reason to believe that there is a computer system currently located on the premises of all the Target Locations.

200.   *Forensic evidence.*   As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the premises because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.     As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.

This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last,

information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

      c.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

      d.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.    I know that when an individual uses a cell phone or computer to facilitate the Target Offenses, the individual's cell phone or computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The cell phone or computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The cell phone or computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a cell phone or computer used to commit a crime of this type may contain: data that is evidence of how the cell phone or computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

201.    *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the

premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.      The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.      Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer

hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

        c.     Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

202.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.  Attachment B further outlines the Search Procedure and I incorporate Attachment B as if fully set forth herein.

203.  Because several people share the premises as a residence, such as Target Location 1, Target Location 4, Target Location 5, Target Location 6, Target Location 10, Target Location 12, Target Location 16, Target Location 17, Target

Location 18, and Target Location 19, it is possible that the premises will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

204.   Serendipity Business Solutions, LLC at Target Location 2, TD Christy Allstate Insurance Agency, LLC at Target Location 3, QBC International, Inc. at Target Location 11, Jeans Jewelry, Inc. at Target Location 13, Ohansons, LLC at Target Locations 14 and 15, Phoenix Fisheries at Target Location 19, Serendipity Business Solutions, LLC at Target Location 20, Greg Abrams Seafood at Target Location 21, and Phillips Seafood at Target Location 22 ("the companies") are functioning companies that conduct some legitimate business. The seizure of the companies' computers may limit the companies' ability to conduct their legitimate business. As with any search warrant, I expect that this warrant will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied. Where appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption. If employees of the companies so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be

necessary or important to the continuing function of the companies' legitimate business. If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

## FORFEITURE

205.   This application requests the issuance of a warrant pursuant to multiple authorities for seizure of property subject to forfeiture. Seizure is appropriate under 21 U.S.C. §§ 853(f) and 881 because: (1) there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture, and (2) an order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the property for forfeiture. There is further authority to seize under 18 U.S.C. § 981(b) and 28 U.S.C. § 1355(d) because there is probable cause to believe that the property is forfeitable under civil law, *to wit*, 16 U.S.C. § 1860 and 18 U.S.C. §§ 981(a)(1), 982, 983, and 984.

206.   There is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture, because the property is:

a. involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957 and 1960, or any property traceable to such property, all in violation of 18 U.S.C. § 982(a)(1);

b. proceeds, or is derived from proceeds, that the defendant obtained directly or indirectly, as the result of a violation of 18 U.S.C. §§ 1341 and 1343, all in violation of 18 U.S.C. § 982(a)(2)(A);

c. a vessel, vehicle, aircraft, and other equipment used to aid in the importing, exporting, transporting, selling, receiving, acquiring, or purchasing of fish or wildlife or plants in a felony violation of Chapter 53 of the United States Code, all in violation of 16 U.S.C. § 3374;

d.

i.    a controlled substance which has been manufactured, distributed, dispensed, or acquired in violation of Subchapter I of Chapter 13 of the United States Code,

ii.    a raw material, product, and equipment of any kind which is used, or intended for use, in manufacturing, compounding, processing, delivering, importing, or exporting any controlled substance or listed chemical in violation of Subchapter I of Chapter 13 of the United States Code,

iii.    property which is used, or intended for use, as a container for property described in paragraph (i), (ii), or (ix),

iv.    a conveyance, including an aircraft, vehicle, or vessel, which is used, or is intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of property described in paragraph (i), (ii), or (ix),

95

v.   a book, record, and research, including a formula, microfilm, tape, and data which is used, or intended for use, in violation of Subchapter I of Chapter 13 of the United States Code,

vi.   money, negotiable instrument, security, or other thing of value furnished or intended to be furnished by any person in exchange for a <u>controlled substance</u> or <u>listed chemical</u> in violation of Subchapter I of Chapter 13 of the United States Code, all proceeds traceable to such an exchange, and money, negotiable instrument, and security used or intended to be used to facilitate any violation of Subchapter I of Chapter 13 of the United States Code,

vii.   real property, including a right, title, and interest (including a leasehold interest) in the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of Subchapter I of Chapter 13 of the United States Code punishable by more than one year's imprisonment,

viii.   a <u>controlled</u> substance which have been possessed in violation of Subchapter I of Chapter 13 of the United States Code,

ix.   a listed chemical, <u>drug</u> manufacturing equipment, a tableting machine, an encapsulating machine, and a gelatin capsule, which has been imported, exported, manufactured, possessed, distributed, dispensed, acquired, or intended to be distributed, dispensed, acquired, imported, or exported, in violation of Subchapter I or II of Chapter 13 of the United States Code,

96

      x.    <u>drug</u> paraphernalia (as defined in 18 U.S.C. § 863), and

      xi.    a firearm (as defined in 18 U.S.C. § 921) used or intended to be used to facilitate the transportation, sale, receipt, possession, or concealment of property described in paragraph (i) or (ii) and proceeds traceable to such property, all in violation of 21 U.S.C. § 881(a).

207.   There is also probable cause to believe that the property to be seized would be subject to civil forfeiture because the property is:

      a.    a fishing vessel, or a part thereof, (including its fishing gear, furniture, appurtenances, stores, and cargo) used, and any fish (or the fair market value thereof) taken or retained, in any manner, in connection with or as a result of the commission of any act prohibited by 16 U.S.C §§ 1857 and 1861(c), all in violation of 16 U.S.C § 1860;

      b.    involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957 and 1960, and property traceable to such property, all in violation of 18 U.S.C. § 981(a)(1)(A); and

      c.    property, real or personal, which constitutes or is derived from proceeds traceable to dealing in a controlled substance or listed chemical, and to a violation of 18 U.S.C. §§ 1341 and 1343, all in violation of 18 U.S.C. §§ 981(a)(1)(C), 1956(c)(7)(A), and 1961(1).

208.   I am aware that pervasive criminal wrongdoing by a business obviates the need for tracing in forfeiture actions. That is, when a business is "used as a

vehicle to commit fraud" and "that fraud touched everything," all "items connected to [the business's] revenue stream are subject to forfeiture." *United States v. Smith*, 749 F.3d 465, 488-89 (6th Cir. 2014); see also *United States v. Lang*, No. 1:12-CR-104, 2015 WL 4207109, at *2 (E.D. Tenn. July 10, 2015) (finding that when "vast majority" of business's proceeds comes from illegal activity, government can forfeit "entirety" of the proceeds even if the business was not "a wholly illegitimate enterprise") (emphasis added). In *United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010), the Sixth Circuit held that "the entirety" of a company's revenue was forfeitable, "including money generated through supposedly legitimate transactions," because even legitimate sales "resulted 'directly or indirectly' from a conspiracy to commit fraud." *Id.* at 332; see also *United States v. Torres*, 703 F.3d 194, 199 (2d Cir. 2012) ("so long as there is a causal nexus between the wrongdoer's possession of the property and her crime, the property may be said to have been 'obtained' by her 'indirectly' as a result of her offense . . . the forfeiture statute envisions and tolerates some attenuation of the chain of events between the crime and the related property or gain it makes subject to forfeiture.").

## CONCLUSION

209. I submit that this affidavit supports probable cause for a warrant to search the premises described in Attachment A-20 and seize the items described in Attachment B.

## REQUEST FOR SEALING

210.   It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time.  Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

_____
TFO Utilio Rivera, DEA

Sworn to and subscribed before me this __25th__ day of August, 2020.

_____
Honorable Michael J. Frank
United States Magistrate Judge